# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

MEDAPPROACH HOLDINGS, INC., )
           )
    **Plaintiff,** )
           )    **Case No. 3:11-cv-1199**
           )    **Judge Trauger**
**v.** )
           )
**GREGORY D. HAWKINS and** )
**SHARON HAWKINS,** )
           )
    **Defendants.** )

## MEMORANDUM

Pending before the court is the defendants' Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue (Docket No. 31), to which the plaintiff has responded (Docket No. 41), and the defendants have filed a reply (Docket No. 44). For the reasons discussed herein, the defendants' motion will be denied.

## BACKGROUND

The plaintiff, MedApproach Holdings, Inc. ("MAH"), is a Delaware corporation that is the general partner of MedApproach, L.P. ("MedApproach"), a Delaware limited partnership. (Docket No. 26 at 1.) Both MAH and MedApproach maintain their principal place of business in Nashville, Tennessee. (*Id.*) MedApproach has served and continues to serve as a vehicle through which investments have been made to fund a project to manufacture and distribute a controversial pharmaceutical product in the United States. (Docket No. 26 at 3; Docket No. 39 at 1.) The defendants, Gregory and Sharon Hawkins, are New York State residents who invested funds in the aforementioned project through MedApproach. (Docket No. 26 at 1; Docket No. 39 at 1.)

1

In this suit, MAH alleges that the defendants conspired to fraudulently induce it to allocate funds that they had already invested or agreed to invest in MedApproach to other corporate entities that directly invested those funds in the project. (Docket No. 26 at 6-11.) The purpose of this alleged scheme, which involved material misrepresentations of fact by Mr. Hawkins, was to avoid paying MAH certain management and profit participation fees that otherwise attached to funds invested in the project through MedApproach. (*Id.* at 3, 6-11.) MAH also alleges that, by virtue of this scheme, the defendants breached a contractual obligation to place their investments in the project through MedApproach. (*Id.* at 11.)

The plaintiff commenced this action on December 20, 2011 (Docket No. 1) and filed an Amended Complaint on July 6, 2012 (Docket No. 26). The defendants filed the pending motion to dismiss on July 30, 2012.[1] (Docket No. 31) In their motion, the defendants seek dismissal on the grounds that: (1) they are not subject to personal jurisdiction; and (2) venue is improper in this district. (*Id.*) Mr. and Mrs. Hawkins have each provided certifications in support of their motion to dismiss. (Docket No. 32-2; Docket No. 32-5.)

In their certifications, the defendants detail their involvement in investing funds in the project, which based its operations in New York, and assert that they had insubstantial contacts with Tennessee throughout the course of their investment activities. (Docket No. 32-2; Docket No. 32-5.) For instance, Mr. Hawkins asserts that, in 1995, a childhood friend of his, William Fiser, informed him of an investment opportunity in a drug called mifepristone, which was a

---

[1] On the same date, the defendants also filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) on the ground that the plaintiff has failed to state claims upon which relief can be granted. (Docket No. 33.) That motion is addressed in a concurrently issued Memorandum Opinion.

2

chemical abortifacient that had been used in Europe for several years under the name RU-486. (Docket No. 32-5 ¶ 5.) He adds that, because it was used to induce abortions, it was a highly controversial drug that was not licensed for use in the United States. (*Id.*) Mr. Hawkins claims that he learned from Fiser that Roussel Uclaf, the European manufacturer of the drug, had granted an exclusive license to The Population Council ("PopCo"), a New-York based entity, to develop and market the drug in the United States, and that PopCo was close to finalizing a sub-licensing agreement with Joseph Pike, a United States-based promoter. (*Id.*) He also asserts that Fiser informed him that Pike was looking for investors in the project ("mifepristone project"), which was being operated out of New York, and agreed to set-up an introduction. (*Id.* ¶ 6.) After meeting with Pike in early 1995 to discuss the project, Mr. Hawkins concluded that it was a worthwhile investment. (*Id.*)

Fiser then informed Mr. Hawkins that: (1) his cousin, Brad Daniel, was affiliated with a hedge fund that was pooling together investor funds in the mifepristone project; and (2) Mr. Hawkins should speak with Daniel. (Docket No. 32-5 ¶ 8.) Mr. Hawkins states that Daniel then contacted him to discuss his business and, among other things, conveyed his belief that investors could receive better terms from Pike if they pooled their investments. (*Id.* ¶ 9.) According to his certification, Mr. Hawkins claims that he agreed to invest in Daniel's fund (MedApproach) primarily due to his relationship with Fiser. (*Id.*)

Mr. Hawkins claims that, aside from the fact that he invested funds in the mifepristone project through MedApproach, he never had any substantial Tennessee contacts. (Docket No. 32-5 ¶ 23.) He adds that, while he met with Daniel once or twice, those meetings took place in either Arkansas or New York. (*Id.*) He lists the following contacts that he had in New York in

connection with the project: (1) he attended a limited partnership meeting and negotiation sessions concerning the project's reorganization in New York; (2) he met with Pike, the promoter of the mifepristone project, in New York; and (3) his investments were directed to the project's operations, which were based in New York. Mr. Hawkins also asserts that his investments are now held by Delaware entities, which, in turn, are investing in the mifepristone project through a California limited partnership. (*Id.*)

In her certification, Sharon Hawkins states that she has been a resident of New York State since 1986 and that she has only visited Tennessee to tour Vanderbilt University with her daughter in 2009 and to attend a wedding in 2010. (Docket No. 32-2 ¶ 1.) Mrs. Hawkins states that her involvement in the project to license, develop, and market mifepristone in the United States began in the middle of 1998, when her husband transferred to her his interest in the project. (*Id.* ¶¶ 2-3.) She asserts that this transfer arose out of an agreed division of Mr. Hawkins' assets between the two of them in order to financially protect family members in the event something were to happen to him. (*Id.* ¶ 3.) She claims that she never spoke to or met with anyone from Tennessee concerning the mifepristone project or her specific investments therein. (*Id.* ¶ 8.)

In support of its response, MAH filed the Affidavit of W. Bradley Daniel (Docket No. 39) ("Daniel Affidavit"). Daniel states that he has lived in Nashville, Tennessee for over 25 years, approximately 20 of which have been spent working in money management, where he has focused on investing in healthcare-related companies. (Docket No. 39 ¶ 2.) In 1993, Daniel formed two biotech hedge funds and a private equity fund that provided seed money to medical and pharmaceutical companies. (*Id.*)

4

Through his private equity fund, Daniel discovered an opportunity in 1995 to invest in the mifepristone project. (Docket No. 39 ¶ 3.) He then formed MedApproach as a vehicle through which individuals could invest in the project. (*Id.* at ¶ 3.) At the time, MedApproach was a Tennessee limited partnership managed by its general partner, BioPharm Investments, Inc. ("BioPharm"), a Tennessee corporation controlled by Daniel. (*Id.* ¶¶ 7-8.) Daniel states that the majority of his income is earned by identifying investment opportunities, assembling a group of investors as limited partners in a limited partnership, and then assessing management and participation fees as owner of the general partner. (*Id.* ¶ 3.)

Daniel asserts that he met Mr. Hawkins in 1995 through an introduction by Fiser, his cousin from Arkansas. (Docket No. 39 ¶ 6.) According to Daniel, Fiser believed that Mr. Hawkins would invest in MedApproach, which, in turn, would invest in the mifepristone project. (*Id.*) Daniel claims that, due to its controversial nature, Mr. Hawkins expressed concern that his name not be publicly associated with the project. (*Id.* ¶ 7.) He adds that Mr. Hawkins subsequently invested in the project through MedApproach and that he did so through payments to accounts based in Nashville, Tennessee. (*Id.* at ¶¶ 7-8)

According to Daniel, the mifepristone project underwent a reorganization in 1996, whereby MedApproach purchased a controlling interest in the project from Pike, the sub-licensee who had formed the project's operating companies. (Docket No. 39 ¶ 9.) Daniel asserts that, as part of the acquisition, PopCo, the sub-licensor, insisted upon a requirement that all individuals who had already invested in the project be given an opportunity to rescind their investments. (*Id.* ¶ 10.) Mr. Hawkins is alleged to have agreed to provide the necessary funding for any rescission requests and, in 1997, executed a "Back-Stop Liability" Agreement, whereby he promised to

5

satisfy MedApproach's obligations to honor such rescission demands with the understanding that any such payments were made on MedApproach's behalf and would inure to its benefit to reduce its liability. (*Id.*) All funds paid or promised to be paid by Mr. Hawkins pursuant to this obligation were to be sent to MedApproach in Tennessee. (*Id.*)

Daniel states that, on July 2, 1998, he, as owner of BioPharm, granted Mr. Hawkins permission to assign his interests in MedApproach to his wife. (Docket No. 39 ¶¶ 11-12.) Daniel claims that Mr. Hawkins' request to assign his interests were made to him in Tennessee. (*Id.* ¶ 12.) Daniel states that, later, in the fall of 1998, he accepted Mrs. Hawkins' request that, in the event that her husband failed to honor his funding commitments, recourse against her be limited to a "set-off" against the MedApproach interests assigned to her. (*Id* ¶ 13.) Leaving this request aside, Daniel asserts that, following the assignment, Mrs. Hawkins' Med Approach interests have always been managed by her husband, who spoke and acted on her behalf. (*Id.* ¶¶ 24-25.)

Notwithstanding his agreement to do so, Daniel claims that Mr. Hawkins failed to fully honor his commitments to fund MedApproach's obligations. (Docket No. 39 ¶ 14.) Daniel adds that, after the collapse of Mr. Hawkins' hedge fund, Long-Term Capital Management, Mr. Hawkins told him that he was "broke." (*Id.*)

At some point it was determined that MedApproach required its own reorganization.[2] (Docket No. 39 ¶ 15.) Under the reorganization, the preexisting MedApproach entity was dissolved, and three new Delaware limited partnerships were created in its stead, all of which were operated by Daniel from Nashville, Tennessee. (*Id.* ¶¶ 15, 19.) One of those limited

---

[2] Daniel asserts that a Nashville-based attorney provided legal services in connection with this process. (*Id.*) Mr. Hawkins is alleged to have made suggestions to the attorney in Nashville concerning the contents of the agreements underlying the reorganization, which were largely accepted. (*Id.*)

6

partnerships bore the same namesake as the recently-dissolved MedApproach. (*Id.* ¶¶ 15-16.) The principal shareholders of BioPharm, including Daniel, also created MAH, which assumed all of BioPharm's rights and responsibilities as the general partner of each of the three newly created limited partnerships. (*Id.* ¶ 15.) Another entity, MedApproach Management, Inc. ("MAM"), a Tennessee company, was also formed during the reorganization to provide administrative services on behalf of MAH. (*Id.*) Daniel asserts that both MAH and MAM remain under his control in Tennessee.

According to Daniel, Mrs. Hawkins, the assignee of Mr. Hawkins' limited partnership interest in MedApproach, participated in and consented to this reorganization. (*Id.* ¶¶ 15-16.) He adds that both defendants knew that the newly organized MedApproach was controlled by him through MAH. (*Id.* ¶ 16.) They also knew that MAH was to receive compensation in the form of deferred annual management fees and profit participation fees that were payable once all capital was returned to investors. (*Id.*) Daniel claims that he discussed the aforementioned measures with the defendants in substantial detail.[3] (*Id.*) He also claims that he met with Mr. Hawkins at his office in Tennessee, although he fails to specify what topics they specifically discussed.[4] (*Id.*)

---

[3] In support of their reply brief, the defendants filed a supplemental certification from Mrs. Hawkins, alleging that Daniel's assertion that he had discussions with her about the project was false. (*See* Docket No. 44-1 ¶¶ 2-3.)

[4] Mr. Hawkins appears to dispute this assertion, as he alleges in his affidavit that his meetings with Daniel occurred outside Tennessee. (Docket No. 32-5 ¶ 23; Docket No. 44 at 4, n.2.) Nonetheless, in undertaking its jurisdictional inquiry, the court is to construe the facts presented in the light most favorable to the party asserting jurisdiction (here, MAH), and is not to weigh or consider the conflicting facts presented by the other side. *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002); *see also Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 360-61 (6th Cir. 2008).

7

The Daniel Affidavit also offers details concerning alleged misrepresentations made by Mr. Hawkins while requesting that funds held by MedApproach be reallocated to various Delaware limited liability companies he formed. Specifically, he states that Mr. Hawkins made telephone calls to him in Tennessee expressing his need to transfer approximately $3 million of his wife's interests out of MedApproach and into the various LLCs in order to induce other individuals to invest funds in the mifepristone project.[5] (Docket No. 39 ¶ 19.) Mr. Hawkins also allegedly told Daniel that none of the transferred funds would inure to either his or his wife's benefit. (*Id.*) With respect to one of the Delaware entities, Shiroyama, LLC ("Shiroyama"), Mr. Hawkins informed Daniel that the true investor was a priest who insisted upon absolute confidentiality. (*Id.*) Mr. Hawkins added that a $320,000 allocation of his wife's interest from MedApproach was required as a "sweetener" to secure from this individual a total investment of $1,263,877. (*Id.*) Daniel states that he granted Mr. Hawkins' request to transfer the aforementioned allocation of his wife's interests to Shiroyama and the other LLCs. (*Id.* ¶¶ 19, 25)

Daniel now asserts that Mr. Hawkins' representations concerning the need to allocate his wife's MedApproach interests to Shiroyama were false. (Docket No. 39 ¶ 20.) In particular, Daniel points out that Mr. Hawkins has admitted that the alleged Shiroyama investor who demanded confidentiality later backed out of his investment and that the LLC is now wholly-

---

[5] In his affidavit, Daniel fails to specify when these telephone calls were made. However, at the very least, it appears that they were made prior to June 14, 1999, which is the date Daniel alleges the transfers to the LLCs were made. (*See* Docket No. 39 ¶ 25.) According to Mr. Hawkins, the LLCs were created to shield the investors' identities from anti-abortion groups. (Docket No. 32-5 ¶ 19.)

8

owned by Mr. Hawkins himself.[6]  (*Id.* ¶¶ 20, 25.)  He adds that Mr. Hawkins' representations concerning the alleged Shiroyama investor were intended to induce him to permit a transfer of funds out of MedApproach into entities where they were directly invested in the mifepristone project without being subject to MAH's management and profit participation fees.  (*Id.* ¶ 20.)

## ANALYSIS

### I.  Motion to Dismiss for Lack of Personal Jurisdiction

In considering a motion to dismiss for lack of personal jurisdiction, a court has three options.  It may (1) rule on the motion on the basis of the affidavits submitted by the parties, (2) permit discovery in aid of the motion, or (3) conduct an evidentiary hearing on the merits of the motion.  *See Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998) .  It is in the court's discretion, based on the circumstances of the case, which path to choose.  *Id.*  In any proceeding, however, the party asserting jurisdiction has the burden of proof.  *See Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002).  "Additionally, in the face of a properly supported motion for dismissal, the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction."  *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).

Where, as here, both sides have submitted competing affidavits and requested a decision on that basis, it is entirely appropriate for the court to decide the jurisdictional issue based on the affidavits presented.[7]  *Theunissen*, 935 F.2d at 1458.  When a court rules on a motion to dismiss

---

[6] Based on the record currently before the court, it is unclear whether the portion of Mrs. Hawkins' MedApproach interests transferred to Shiroyama were somehow eventually re-acquired by her husband.

[7] Based on their citations to these documents throughout their moving papers, it appears that the defendants are requesting the court to rule on the certifications they presented.  (*See*

for lack of personal jurisdiction based upon the affidavits, the party asserting jurisdiction need only make a *prima facie* showing of jurisdiction to defeat the motion. *Id.* In examining whether the party asserting jurisdiction has made this *prima facie* showing, the court is to construe the facts presented in the light most favorable to that party, and the court does not weigh or consider the conflicting facts presented by the other side. *Bird*, 289 F.3d at 871; *see also Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 360-61 (6th Cir. 2008) (referring to the plaintiff's burden in this context as "relatively slight").

The issue of whether this court may exercise personal jurisdiction over the defendants depends on the specific limitations of Tennessee's long-arm statute and the constitutional principles of due process. *Bridgeport Music, Inc. v. Still N The Water Publ'g*, 327 F.3d 472, 477 (6th Cir. 2003). Tennessee's long-arm statute has been consistently construed to extend to the limits of federal due process and, therefore, the two inquiries are merged, and the court need only determine whether exercising personal jurisdiction over the defendants here is consistent with federal due process requirements. *Id.*

In order for due process to permit the exercise of personal jurisdiction over non-resident defendants, like Mr. and Mrs. Hawkins, those defendants must have "certain minimum contacts

---

Docket No. 32; Docket No. 44.) For its part, MAH also appears to request a decision on the affidavits. Indeed, in its response, MAH filed the Daniel Affidavit and did not otherwise request the court to order further discovery or to conduct an evidentiary hearing. (*See* Docket No. 41.) While in the last sentence of their reply brief, the defendants alternatively request the opportunity to take additional discovery and have an evidentiary hearing on the issue of jurisdiction (Docket No. 44 at 10), the court believes that this motion can nonetheless be decided on the affidavits presented. The basis for the defendants' alternative request is an alleged fabrication made by Daniel in his affidavit, wherein he states that he discussed the mifepristone project with Mrs. Hawkins. (Docket No. 44 at 8, n.4, 10.) However, MAH does not cite these alleged conversations in its opposition brief as a basis to assert jurisdiction over Mrs. Hawkins and, in any event, the court does not find them to be dispositive to its analysis.

with the [forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Youn v. Track, Inc.*, 324 F.3d 409, 417 (6th Cir. 2003) (*quoting Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The Supreme Court has identified "general" jurisdiction and "specific" jurisdiction as distinct bases for personal jurisdiction - a demonstration of the contacts necessary for either basis is sufficient to establish personal jurisdiction. *Id.* at 417-18.

A court may exercise general jurisdiction over a non-resident defendant when his contacts "are so continuous and systematic as to render [him] essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, --- U.S. ---, 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011) (internal quotation marks omitted). In such instances, a court may exercise jurisdiction over claims that are unrelated to a non-resident defendant's contacts with the forum. *Id.* at 2853-54. "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Id.* at 2853.

The assertion of specific jurisdiction "depends on an affiliatio[n] between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*, 131 S.Ct. at 2851 (internal quotation marks and citations omitted). Unlike general jurisdiction, "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id.* The Sixth Circuit has established a three-part test for determining whether the exercise of specific jurisdiction is consistent with the principles of due process ("the *Mohasco* test). *See S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1969). Under this test, the exercise of such jurisdiction is proper if the court finds: "(1) purposeful

availment 'of the privilege of acting in the forum state or causing a consequence in the forum state,' (2) a 'cause of action . . . aris[ing] from activities' in the state, and (3) a 'substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.'" *Schneider v. Hardesty*, 669 F.3d 693, 701 (6th Cir. 2012) (*quoting S. Mach. Co.*, 401 F.2d at 381). While a motion to dismiss for lack of specific personal jurisdiction may be maintained based on prongs two and three of the *Mohasco* test, purposeful availment is the *sine qua non*, or absolutely indispensable, element of personal jurisdiction, and, therefore, disputes about whether or not there is specific personal jurisdiction in a given case often rise or fall on the issue of purposeful availment. *See Air Prods. and Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 550-51 (6th Cir. 2007).

In the present case, the defendants argue that this court lacks specific jurisdiction over them. The court will limit its analysis accordingly in determining whether it possesses jurisdiction over each defendant.

### A. Gregory Hawkins

#### (1) Purposeful Availment

The first prong of the three-part *Mohasco* test applied to determine whether a court may exercise specific jurisdiction analyzes whether there is purposeful availment. Indeed, before a defendant may be sued in a forum, the defendant "must purposefully avail" himself of the "privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (*quoting Hanson v. Denckla*, 357 U.S. 235, 253 (1958). This "requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, . . .

12

or of the unilateral activity of another party or a third person." *Id.* (internal quotation marks and citations omitted).

Purposeful availment is "something akin to a deliberate undertaking to do or cause an act or thing to be done in [the forum state] or conduct which can be properly regarded as a prime generating cause of the effects resulting in [the forum state], something more than a passive availment of [the forum state's] opportunities." *Bridgeport Music, Inc.*, 327 F.3d at 478 (internal quotation marks omitted). Purposeful availment exists "when the defendant's contacts with the forum state proximately result from actions by the defendant himself that create a substantial connection with the forum state, and when the defendant's conduct and connection with the forum are such that he should reasonably anticipate being haled into court there." *Id.* (internal quotation marks omitted).

Critical to analyzing the purposeful availment inquiry with respect to Mr. Hawkins in this case is the issue of how to characterize the nature of this action. For their part, the defendants appear to characterize this suit primarily as a breach of contract dispute whereby the defendants failed to make certain required payments to MAH. (Docket No. 32 at 13.) Thus, citing applicable precedent, they emphasize, among other things, the unilateral activities of the plaintiff in establishing the business relationship with Mr. Hawkins and the fact that MedApproach merely served as a pass-through for Mr. Hawkins' investments in the New York-based mifepristone project in arguing that his contacts with Tennessee were merely random, fortuitous, and attenuated. (*See* Docket No. 32 at 11-13; Docket No. 44 at 3-6.) Viewing the lawsuit through this lens, one might believe that the defendants' position has merit.

13

However, the gravamen of MAH's Amended Complaint has a different focus. Indeed, at its heart, this action sounds in fraud. It is based on alleged misrepresentations made by Mr. Hawkins to Daniel in Tennessee for the purpose of inducing MAH to transfer a portion of Mrs. Hawkins' interests held by MedApproach to entities created by Mr. Hawkins such that MAH's management and profit participation fees could no longer attach. (Docket No. 26 at 6-11.) While the Amended Complaint also contains a cause of action for breach of contract due to a purported failure to place investments through MedApproach, that breach was facilitated through the alleged misrepresentations. (*Id.*)

The Sixth Circuit has previously held that "purposeful availment may exist when a defendant makes telephone calls and sends facsimiles into the forum state and such communications form the bases for the action." *Schneider*, 669 F.3d at 702 (citations and internal quotation marks omitted). In his affidavit, Daniel has alleged that Mr. Hawkins made telephone calls to him in Tennessee expressing the need to transfer approximately $3 million of Mrs. Hawkins' interests out of MedApproach and into various Delaware LLCs to induce other individuals to invest in the mifepristone project. (Docket No. 39 ¶ 19.) During the course of the telephone conversations, Mr. Hawkins told Daniel, among other things, that none of the transferred funds would flow to either his or his wife's benefit, but were merely to be used as "sweeteners" for additional investments. (*Id.*) Relying on this representation, Mr. Daniel, as the owner of MAH, agreed to the transfer and, in doing so, consented to the withdrawal of funds from MedApproach that would otherwise have been subject to applicable management and profit participation fees. (*Id.* ¶¶ 19-20.) Mr. Daniel asserts that Mr. Hawkins' representation was false

14

when made and points to the fact that one of the Delaware LLCs, Shiroyama, is actually wholly-owned by Mr. Hawkins.  (*Id.* ¶ 20.)

In sum, the Daniel Affidavit reaffirms what the Amended Complaint alleges - that is, that this action arises out of the representations made by Mr. Hawkins in his telephone calls to Daniel in Tennessee.  Mr. Hawkins' actions of sending false information into Tennessee through such telephone calls had foreseeable effects in Tennessee and were directed at individuals and entities operating within the state.[8]  *Neal v. Janssen*, 270 F.3d 328, 332 (6th Cir. 2001)  Thus, the record demonstrates that Mr. Hawkins' contacts with Tennessee were not random, fortuitous, or attenuated, *Rudzewicz*, 471 U.S. at 475, but were instead the result of his own deliberate undertaking.  *Bridgestone Music, Inc.*, 327 F.3d at 478.  For these reasons, the court finds that MAH has demonstrated "purposeful availment" here.  *See Neal*, 270 F.3d at 330, 332 (finding purposeful availment where an out-of-state defendant retained by the plaintiffs to sell a horse made false representations to the plaintiffs' agent in Tennessee concerning the price of a sales offer he received, and noting that those representations were at "the heart of the lawsuit" and "not merely incidental communications sent by the defendant into Tennessee").

### (2)     Arising From

The second prong of the *Mohasco* test requires that the plaintiff's cause of action arise from the defendant's contacts with the forum state.  *Schneider*, 669 F.3d at 703.  This prong is satisfied when the plaintiff's "causes of action are related to or connected with the defendant's contacts with the forum state."  *Air Prods. and Controls, Inc.*, 503 F.3d at 553 (internal quotation

---

[8] The court emphasizes that, in undertaking its analysis, it is expressing no opinion as to the merits of MAH's causes of action against the defendants.  Instead, it is merely analyzing whether MAH's factual allegations, construed in the light most favorable to it, establish a prima facie case of personal jurisdiction over the defendants.

15

marks omitted).  The standard for satisfying this prong is a lenient one and a "cause of action need not formally arise from [the] defendant's contacts."  *Id.* (internal quotation marks omitted).

This prong is plainly met here.  As the court has previously explained, this dispute arises from Mr. Hawkins' telephone calls to Daniel in Tennessee.  Indeed, the representations made in those calls form the basis for MAH's causes of action for fraud, civil conspiracy, and breach of contract.

### (3)     Reasonableness

The third prong of the *Mohasco* test requires that the defendant "have a sufficiently substantial connection to the forum such that the exercise of jurisdiction is not unreasonable." *Schneider*, 669 F.3d at 703.  "[W]here, as here, the first two criter[ia] are met, an inference of reasonableness arises and only the unusual case will not meet" the reasonableness prong of the *Mohasco* test.  *Id.* (internal quotation marks omitted).  "In determining whether the exercise of jurisdiction is reasonable, the court should consider, among others, the following factors: (1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the [controversy]."  *Id.* at 703-04.

The contacts here are substantial enough to make the exercise of jurisdiction over Mr. Hawkins reasonable.  The plaintiff, MAH, is a company that, although incorporated in Delaware, maintains its principal place of business in Tennessee and has a substantial interest in obtaining relief.  Moreover, Tennessee has an interest "in protecting its residents' legal options."  *Youn*, 324 F.3d at 419.  While the court recognizes that Mr. Hawkins may be burdened in defending a lawsuit in Tennessee, given his New York residency, it notes that, where, as here, "minimum

contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the [non-resident] defendant." *Asahi Metal Indus. Co. v. Superior Court of Cal., Solano Cnty.*, 480 U.S. 102, 114 (1987). Indeed, Mr. Hawkins cannot reasonably object to this burden, given his specific contacts with Tennessee - namely, his telephone calls to Daniel, wherein he made the alleged misrepresentations that form the basis of this lawsuit. Furthermore, while New York may have an interest in adjudicating claims involving one of its residents, "this interest does not override the other factors suggesting that personal jurisdiction in [Tennessee] is reasonable."[9] *See Bird*, 289 F.3d at 876.

In sum, Mr. Hawkins has not shown that this is an "unusual case" requiring the court to cast aside the inference of reasonableness that already exists. Because Mr. Hawkins has failed to set forth any considerations that overcome that inference, the assertion of jurisdiction is reasonable under the circumstances of this case. Thus, as all three prongs of the *Mohasco* test have been satisfied, the court concludes that the exercise of personal jurisdiction over Mr. Hawkins in Tennessee accords with due process.

**B.      Sharon Hawkins**

As for Mrs. Hawkins, the defendants contend that MAH has failed to allege any relevant contact between herself and Tennessee. (Docket No. 32 at 10.) They assert that the plaintiff's reliance on Mrs. Hawkins' alleged consent to do business with a Tennessee entity cannot serve as an adequate basis for personal jurisdiction. (Docket No. 44 at 8.) Because the plaintiff failed to offer evidence demonstrating that Mrs. Hawkins deliberately directed activities into Tennessee

---

[9] The same can also be said with respect to any interest Delaware may possess by virtue of it being MAH's place of incorporation.

17

to achieve some sort of a consequence there, the defendants contend that dismissal of all claims against her is warranted. (*Id.*)

In its opposition brief, the plaintiff places great emphasis on the fact that Mrs. Hawkins signed a letter agreement sent by BioPharm, MAH's Tennessee-based corporate predecessor, wherein she agreed to do business with a Tennessee entity. (Docket No. 41 at 6.) Specifically, MAH points out that the letter agreement provided that, following the MedApproach reorganization, it intended to contract with MAM, a Tennessee corporation, so that MAM could provide administrative and clerical services.[10] (*Id.*) MAH also cites two other agreements between Mrs. Hawkins and BioPharm in support of its personal jurisdiction argument whereby Mrs. Hawkins: (1) agreed to become the assignee of her husband's interests in MedApproach and thus become a limited partner in the enterprise; and (2) successfully obtained BioPharm's consent to limit MedApproach's recourse against her in the event her husband was unable to fulfil his funding commitments in connection with the mifepristone project. (*Id.* at 2, 8-9.)

Having reviewed the record, the court finds that the plaintiff has carried its burden of establishing a prima facie case of personal jurisdiction with respect to Mrs. Hawkins, although not for the reasons it asserts. The defendants rightly point out that the Sixth Circuit has previously noted that the mere existence of a contractual relationship, by itself, is insufficient to confer personal jurisdiction on an out-of-state defendant. *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 722 (6th Cir. 2000). However, as the court has already explained, this case sounds in fraud. While Mr. Hawkins is charged with making the alleged misrepresentations that form the basis of

---

[10] MAH attached this letter agreement as Exhibit A to its Proposed Second Amended Complaint, which is the subject of a separate motion to amend. (*See* Docket No. 38-1.) That motion is addressed in the concurrently issued Memorandum Opinion analyzing the defendants' Rule 12(b)(6) motion to dismiss.

this action, Daniel asserts in his affidavit that Mr. Hawkins continually spoke and acted on his wife's behalf while managing her MedApproach interests. (Docket No. 39 ¶¶ 24-25.) Thus, construing the factual allegations in the light most favorable to MAH, it is reasonable to infer that when Mr. Hawkins called Daniel in Tennessee and, among other things, falsely represented that none of the transferred funds would personally benefit either himself or Mrs. Hawkins, he did so on Mrs. Hawkins' behalf and with at least her tacit approval.[11]  Presumably, Mrs. Hawkins stood to gain from the alleged misrepresentations made by her husband, since her transferred funds would no longer be subject to MAH's management and profit participation fees. Accordingly, the court believes that Mrs. Hawkins' contacts with Tennessee were not random, fortuitous, or attenuated, but were instead sufficiently deliberate to support a finding of purposeful availment.[12]

MAH has also satisfied the remaining prongs of the *Mohasco* test.  The court has already explained that this action arises from telephone calls made by Mr. Hawkins, acting on Mrs. Hawkins' behalf, to Daniel in Tennessee.  Again, the representations made in those calls form the basis for each of MAH's causes of action against the defendants.  Moreover, the same considerations making the exercise of jurisdiction reasonable over Mr. Hawkins similarly support a finding of reasonableness with respect to Mrs. Hawkins, given her implicit approval of

---

[11] While the court acknowledges that it is not to weigh or consider the conflicting facts presented by the other side in examining whether the plaintiff has made a prima facie showing of jurisdiction, *Bird*, 289 F.3d at 871, it nonetheless finds it notable that Mrs. Hawkins does not dispute in either of her certifications that her husband acted on her behalf while managing her MedApproach interests.

[12] Again, the court emphasizes that, in undertaking its analysis, it is expressing no opinion as to the merits of MAH's causes of action against the defendants, but is rather analyzing whether MAH's factual allegations establish a prima facie case of personal jurisdiction.

19

her husband's conduct while managing her MedApproach interests - namely, the aforementioned calls to Daniel. Accordingly, because all three prongs of the *Mohasco* test have been satisfied, the court concludes that the exercise of personal jurisdiction over Mrs. Hawkins in Tennessee also accords with due process.

## II.    Motion to Dismiss for Improper Venue

The defendants also move to dismiss this action under Federal Rule of Civil Procedure 12(b)(3) for improper venue. In support of its assertion that venue is proper in this district, MAH relies on 28 U.S.C. § 1391(a)(2), which states that a diversity action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(a)(2).[13] This section does not require the court to determine where the most substantial events giving rise to the claim occurred; rather venue is proper in "any forum with a substantial connection to the plaintiff's claim." *First of Mich. Corp. v. Bramlet*, 141 F.3d 260, 263 (6th Cir. 1998).

In reviewing a Rule 12(b)(3) motion to dismiss for improper venue, "the court may examine facts outside of the complaint but must draw all reasonable inferences and resolve factual conflicts in favor of the plaintiff." *Receiver of the Assets of Mid-Am. Energy, Inc. v. Coffman*, 719 F.Supp.2d 884, 890 (M.D. Tenn. 2010). If the court determines that venue is improper, it must either dismiss the case or, if it is in the interest of justice, transfer it to a district

---

[13] Congress amended 28 U.S.C. § 1391 on December 7, 2011, and the amended statute took effect on January 6, 2012. *See* Federal Courts Jurisdiction and Venue Clarification Act of 2011, Pub. L. No. 112-63, 125 Stat. 758. However, since this action was filed before January 6, 2012, the court will apply the prior version of the venue statute. In any event, the amendments to § 1391 do not affect the court's venue analysis.

where venue is proper. 28 U.S.C. § 1406. The burden of establishing venue falls on the plaintiff. *See* 14D Charles Alan Wright, et al., *Federal Practice and Procedure*, § 3826 (3d ed. 2012) (noting that the position "that probably represents the weight of judicial authority, is that, when an objection has been raised, the burden is on the plaintiff to establish that the district he or she has chosen is a proper venue").

In support of their motion to dismiss, the defendants argue that venue in the Middle District of Tennessee is improper because all of the operative facts of this case occurred outside the state. (Docket No. 32 at 18; Docket No. 44 at 9.) For its part, the plaintiff argues that venue in this judicial district is appropriate, although its argument largely consists of reproducing a paragraph from its Amended Complaint. (Docket No. 41 at 11.) Nonetheless, the court agrees with the plaintiff that venue in the Middle District of Tennessee is proper.

Again, the record shows that Mr. Hawkins, acting on his wife's behalf, reached out to Tennessee through his phone calls to Daniel, a Nashville resident who owned a company that operated out of Nashville, and made false representations for the purpose of transferring Mrs. Hawkins' interests out of MedApproach (a limited partnership which is also operated out of Nashville) and into various Delaware LLCs, where they would be directly invested in the mifepristone project without being subject to MAH's management and profit participation fees. These alleged misrepresentations lie at the heart of MAH's claims for fraud, civil conspiracy, and breach of contract. Plainly, this evidence demonstrates that the Middle District of Tennessee has a substantial connection to the case. Accordingly, the defendants' Rule 12(b)(3) motion to dismiss for improper venue will be denied.

## CONCLUSION

For all of the reasons discussed herein, the defendants' Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue (Docket No. 31) will be **DENIED**.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

22