**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **MEDAPPROACH HOLDINGS, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CASE NO.: 3-11-CV-01199** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GREGORY D. HAWKINS AND** | ) | |
| **SHARON HAWKINS** | ) | |
| | ) | |
| **Defendants.** | ) | |

## [SECOND PROPOSED] SECOND AMENDED COMPLAINT

## PARTIES

1.     MedApproach Holdings, Inc., is a Delaware Corporation. ("MAH").  MAH is the general partner of MedApproach, L.P., a Delaware limited partnership, which maintains its principal place of business in Nashville, Tennessee. The principle place of business of MedApproach Holdings is in Nashville, Tennessee.  MAH is successor in interest to Bio-Pharm Investments, Inc., a Tennessee corporation.

2.     The Defendants Gregory Hawkins and Sharon Hawkins are citizens and residents of the State of New York and are husband and wife.

## JURISDICTION

3.     Jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1332 (a) (1) because this is an action between citizens of different states and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.  This is a suit brought pursuant to 28 U.S.C. § 2201 (a) and Rule 57, Fed. R. Civ. Proc. asking this Court to declare the rights and legal relations of the parties as described hereafter.

1

## VENUE

4.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this District and a substantial part of the property which is the subject of the claim is situated in this District.

5.     All funds invested by or on behalf of Gregory Hawkins were paid to MedApproach, L.P. or its predecessors or affiliates in Nashville, TN and deposited through local financial institutions.  All management decisions, including the disbursement of funds, which are the subject of this litigation, are made in this District.  All partnership meetings are conducted in this District.  All checks or wire transfers of funds to investors are approved in and processed from Nashville.  The formation of all entities under which business is conducted were created in Nashville through the services of attorneys in this District.   All accounting services are conducted in Nashville.  All tax filings are made from Nashville and represent Nashville as the principal location of the entities whose papers are being filed.

6.     a.)     Attached hereto as Exhibit A to this Complaint, and incorporated herein by reference is an explanatory letter regarding the reorganization sent to Sharon Hawkins from Nashville.  The letter explains the reorganization and is for the purpose of obtaining Mrs. Hawkins' consent.  Mrs. Hawkins consented to the reorganization in writing.

b.)     On page 4 of Exhibit A, Mrs. Hawkins was informed that Plaintiff MedApproach Holdings, Inc., which succeeded BioPharm Investments, Inc. as General Partner, intended to enter into administrative services agreement with MedApproach Management, Inc., a Tennessee Corporation formed by the owners of BioPharm Investments to provide for the day-to-day administrative and clerical function of the partnership.  Mrs. Hawkins thus agreed in

2

writing to transact partnership business with New MedApproach through a Tennessee company, operating in Nashville.

## ALLEGATIONS OF FACT

7.     This lawsuit arises from various obligations concerning the establishment and funding of a business (hereafter, "the Project") involved in the manufacturing and distribution of a controversial pharmaceutical product.  The various agreements referred to in this Complaint are considered confidential.   Consequently, this Complaint will identify and allude to language within these documents but will not attach them as exhibits.  The Defendants already possess copies of each document identified herein and they have been furnished copies in the course of litigation in any event.

8.     In 1995, Gregory Hawkins was approached by Mr. W. Bradley (Brad) Daniel on behalf of Bio-Pharm Investments, Inc. to measure his interest in investing in MedApproach, L.P., through which investments would be made in the Project.  On May 4, 1995, Mr. Hawkins executed a non-circumvention agreement in which he promised not to invest, directly or indirectly, in the Project without the prior written consent of Bio-Pharm Investments, Inc.  The course and conduct of the parties thereafter were consistent with this initial understanding.

9.     Gregory Hawkins is a sophisticated investor who had been in the private equity and hedge fund business prior to his investment in the Project.  He knew from personal experience that fund managers are compensated through management and participation fees. During the same time period of the late 1990s, Mr. Daniel brought another deal to Mr. Hawkins for investment in a software product.  Mr. Daniel and Mr. Hawkins formed The Hawk Fund, L.P. Mr. Daniel owned the General Partner and Mr. Hawkins invested.  The General Partner was to be paid a one (1%) percent management fee and twenty (20%) percent of the profits.  This was

3

the model under which Mr. Hawkins had done business in the past and under which he and Mr. Daniel agreed to do business in all of their dealings, including the Project. Mr. Hawkins understood from his introduction to the Project in 1995 that Brad Daniel was the hedge fund manager through whom he would be allowed to invest. When he did invest he did so exclusively through the entities controlled by Mr. Daniel. The parties understood this arrangement from the outset and because no investment outside the control of Mr. Daniel could have been made. In recognition of this clear, mutual understanding, all of Mr. Hawkins investments were in fact made through and with the consent of entities controlled by Mr. Daniel during the "honeymoon period" of the relationship. Mr. Hawkins later sought to rearrange his Project investments through subterfuge for the very reason of the understanding that all investments were to be made through Mr. Daniel's partnerships.

10. On December 21, 1995, Mr. Hawkins executed a Subscription Agreement and Power of Attorney with MedApproach, L.P., of which Bio-Pharm Investments, Inc. was the General Partner. The purpose of the subscription was to invest in MedApproach as a limited partner. The initial investment was in the amount of $1,000,000.00.

11. Mr. Hawkins executed another Subscription Agreement with MedApproach, L.P. on June 28, 1996 under identical terms, in the amount of $500,000.00.

12. Prior to February, 1997, the Hawkins investments were paid directly to MedApproach, L.P. in Nashville, Tennessee for the purpose of creating limited partnership interests. One of the purposes of this arrangement was to mask the identity of investors, including Gregory Hawkins, because of the controversial nature of the business.

13. Bio-Pharm, as general partner, was to receive as compensation a 1% annual management fee and a 20% share of distributions made after the return of capital to investors.

This is a common and customary arrangement in the business of investing. These terms were accepted by Mr. Hawkins in writing.

14.     In 1996, disagreements arose between the original sub-licensee of the product and the licensor. Because the dispute endangered the Project, MedApproach, L.P. reached an agreement to purchase control of the Project. In order to guarantee that adequate funds were available to MedApproach, L.P. to accomplish the purchase of the controlling interest of the Project, Mr. Hawkins executed a Funding Commitment on February 12, 1997.

15.     In January and February, 1997, an Agreement was negotiated to secure the purchase of a controlling interest in the Project from its controversial owner. The "Agreement Regarding Neogen Project" was reached on January 21, 1997 and amended on February 5, 1997.

16.     In furtherance of this purchase, Gregory Hawkins and two additional investors executed a letter agreement on February 4, 1997 regarding the allocation of "Back-Stop Liability." Because investors had been attracted into the Project by the individual whose interests were being purchased, it was agreed that a rescission offer should be made to them.

17.     The "Back-Stop Liability" agreement provided that the rest of the purchase and rescission would be borne in the proportions of 50% by MedApproach L.P. and 25% each to two other investors. The MedApproach portion was to be paid to and on behalf of MedApproach by Gregory Hawkins. Enumerated paragraph 3 of the letter agreement provides:

> The obligations of Gregory D. Hawkins ("Hawkins") with respect to the Back-Stop Liability are hereby confirmed and acknowledged by the parties hereto *to be made to and on behalf of MedApproach* and any payment made by Hawkins in respect to any Back-Stop Liability shall be deemed to have been made on behalf, and in reduction of the allocated responsibility, of MedApproach as set forth in Paragraph 2 above. (*Emphasis Added*)

18.     In furtherance of this agreement, Mr. Hawkins paid in February, 1997 three million five hundred thousand ($3,500,000.00) dollars to MedApproach, L.P. This investment

equaled the money which was to be paid to the original owner under the "Agreement Regarding Neogen Project."

19.     On April 30, 1998, Mr. Hawkins executed an "Amended and Restated Funding Commitment" in which he as a limited partner of MedApproach, agreed to fund the obligations of MedApproach up to a total of thirteen million seven hundred seventeen thousand six hundred seventy-two ($13,717,672.00) dollars.

20.     On May 28, 1998, Mr. Hawkins executed a letter agreement in which he agreed that, in the event his funding obligation under the terms of the "Amended and Restated Funding Commitment" was called upon, he would make a capital contribution *to* MedApproach in an amount necessary to satisfy his *joint* obligation with MedApproach under the commitment. This agreement was consistent with the course and conduct of the parties. At this juncture, all of Mr. Hawkins' investments were through MedApproach Holdings, Inc. or its predecessor and were subject to fees to the General Partner.

21.     Mr. Hawkins was a principal in Long-Term Capital Management, L.P. ("LTCM"), a hedge fund engaged in bond arbitrage, founded upon billions of dollars in investments and unlimited hubris. In August, 1998, Long Term's portfolio declined by 44%, giving it a year-to-date decline of 52%, according to the September 21, 1998 edition of Business Week. Long Term collapsed and its investors suffered substantial losses.

22.     By the end of the second quarter of 1998, Mr. Hawkins had invested in MedApproach, L.P. seven million four hundred thousand ($7,400,000.00) dollars. Only seventy-five thousand ($75,000.00) dollars was invested thereafter in 1998, and Mr. Hawkins revealed no personal investments in the Project thereafter until after the filing of this lawsuit. The project has over fifty (50) investors, all limited partners.

6

23.     On July 2, 1998, Gregory Hawkins transferred his limited partnership interest and obligations in MedApproach, L.P., to his wife, Defendant Sharon Hawkins.  As described more fully, infra, this transfer required the consent of the General Partner, Bio-Pharm Investments, Inc. Bio-Pharm was controlled by Brad Daniel, whose personal consent Mr. Hawkins sought.  By letter agreement of November 9, 1998, recourse against Sharon Hawkins was limited to set off against the interest assigned.  This done at the request of Gregory Hawkins on behalf of his wife Sharon Hawkins to Brad Daniel, at or shortly prior to November 9, 1998.

24.     MAH and its predecessor, Bio-Pharm Investments, had no obligation to release or reallocate limited partnership shares merely upon request.  Because MAH controlled MedApproach, L.P. as general partner, and the sole mechanism of payment to the General Partner consisted of accrued management fees and shares in distribution after return of capital, it had no rational motivation to do so.

25.     Because MAH is the General Partner of MedApproach and its sole member, Brad Daniel, also chairs the board of the Project, no investments directly into the Project by Mr. and Mrs. Hawkins were required to be accepted and none would have been, in the absence of material misrepresentations of fact to Brad Daniel by Gregory Hawkins.

**FACTUAL ALLEGATIONS RELATED TO FRAUD**

26.     Sharon and Greg Hawkins entertained Brad Daniel at their home in Saratoga, NY, in July, 1998.  Greg Hawkins told Brad Daniel at that time that something was "terribly wrong" with LTCM and that as a result he would have little or no further funds to invest in MedApproach.  Greg Hawkins told this to Mr. Daniel in the parking lot at the Saratoga racetrack and reiterated this concern to Mr. Daniel during lunch at a private club at the track in which Mr. Hawkins was a member.

7

27.     Mr. Hawkins requested transfer of his interests of to his wife Sharon Hawkins by letter of July 2, 1998, contemporaneously with Mr. Hawkins' expressed concerns to Mr. Daniel about the viability of LTCM.

28.     In September, 1998, Greg Hawkins spoke to Brad Daniel in San Diego, CA.  The impending collapse of LTCM was by that time public.  Greg Hawkins, who at that time had an as yet unfunded commitment of up to fourteen million ($14,000,000) dollars to MedApproach, told Mr. Daniel that he was losing his assets and going "broke."  He said again that he no longer had the resources to invest much more money in MedApproach.

29.     The Danco Recisśon/Capital offering closing took place on June 14, 1999, in Nashville, TN.  On that day Greg Hawkins sent by facsimile to Brad Daniel a handwritten chart indicating how he wished for the interests he had transferred to Sharon Hawkins to be transferred to several limited liability companies.  One of these entities was Shiroyama, LLC.

30.     Contemporaneously with this request, in June, 1999, Greg Hawkins stated by telephone in New York to Brad Daniel that he was "out of money" and "broke."  He represented to Mr. Daniel that neither he nor Sharon Hawkins had any interest in any of the new LLCs and urged Mr. Daniel to allow the transfers to assist him in raising money.

31.     Gregory Hawkins and Mr. Daniel spoke by telephone between New York and Nashville, TN almost weekly in the first half of 1999 until the closing on June 14, 1999.  On each occasion Mr. Hawkins represented to Mr. Daniel that neither he nor Sharon Hawkins owned any interest in any of the LLCs and would not benefit directly from any of them, including Shiroyama.  After the transfer of interests to Sharon Hawkins on July 2, 1998, Gregory Hawkins acted for and on behalf of his wife.  Because Sharon Hawkins' consent was

8

required to make the transfers to LLCs requested by her husband, she understood and participated in them.

32.    During the June, 1999 telephone conversations between Greg Hawkins in New York and Brad Daniel in Tennessee, Mr. Hawkins told Mr. Daniel that "he" needed to transfer approximately three million ($3,000,000) dollars in interests which were now on the books as belonging to Sharon Hawkins because "he" needed to entice new investors into the project in light of his "broke" condition.  Because he had agreed to "back-stop" the obligations of MedApproach and purportedly lacked the funds to do so, the recruitment of new investors was appropriate.  Because a failure by Mr. Hawkins to honor his funding commitment could now result in a set off against Sharon Hawkins interests, raising more funds would inure to her benefit as well.

33.    Gregory Hawkins' personal accountant, Mr. David Untracht, formed all five (5) of the Delaware, LLCs.  Gregory Hawkins asked that three hundred twenty thousand ($320,000.00) dollars of his wife's MedApproach, L.P. investment be transferred to the account of Shiroyama, LLC.

34.    It was during the conversations in June, 1999 described in ¶ 32, at the dates and places described therein, that Greg Hawkins represented to Mr. Daniel that the true investor in Shiroyama, LLC was a Catholic priest who insisted upon absolute confidentiality, and that three hundred twenty thousand ($320,000) dollars of Sharon Hawkins' interests had been offered for allocation to Shiroyama as a "sweetener" to attract the investment of the priest toward a total investment of one million two hundred sixty-three thousand, eight hundred seventy-seven ($1,263,877) dollars.  Greg Hawkins stated that he had "surrendered" this interest to raise money for the Project.

9

35.     Based upon these representations of Greg Hawkins, which he made on behalf of himself and Sharon Hawkins, Brad Daniel agreed to the transfer of three hundred twenty thousand ($320,000) dollars in Sharon Hawkins' interests to Shiroyama on June 14, 1999 and accepted three hundred fifty thousand ($350,000) dollars on June 10, 1999, three hundred forty-three thousand eight hundred seventy-six dollars seventy-one ($343,876.71) cents on February 10, 2000, and two hundred fifty thousand ($250,000) dollars on September 21, 2000 into Danco and outside MedApproach.  In the absence of these representations of Greg Hawkins on behalf of himself and his wife in June, 1999 by telephone and written communications from New York to Nashville, TN, Mr. Daniel would not have agreed to the transfer and would not have accepted the purported priest's investment through Shiroyama.

36.     The representations of Greg Hawkins to Brad Daniel in June, 1999, on behalf of himself and Sharon Hawkins were false.  No priest was an actual or potential investor.  Even if the priest truly existed, he did not then and did not thereafter invest in the Project through Shiroyama.  All of the funds were those of Greg and Sharon Hawkins.  Brad Daniel on behalf of MedApproach relied upon the representations.

37.     While Greg Hawkins suffered significant financial losses as a result of the collapse of LTCM, his investment of nearly a million dollars in Shiroyama demonstrates, *ipso facto*, that he was not "broke" in the ordinary meaning of that word.

38.     All five (5) LLCs were formed in Delaware by Greg and Sharon Hawkins' New Jersey accountant, Mr. David Untracht.  On January 31, 2001, Mr. Untracht provided to Marjorie Soifer, bookkeeper for the Project in Nashville, a tax identification number for Shiroyama.  It was Greg Hawkins' personal social security number.  On February 2, 2001, Mr.

Untracht provided numbers for the remaining four (4) LLCs.  That for Resurgence was Sharon Hawkins' personal social security number.

39.    By telephone in the first week of February, 2001, Greg Hawkins in New York represented to Brad Daniel in Nashville that these were mere "placeholders" to secure the names.  On February 6, 2001, Mr. Untracht advised Ms. Soifer by email that "I gave you bad identification numbers for the LLCs, and promised to provide "proper" numbers in the next few days.  On February 27, 2001, new numbers were emailed to Ms. Soifer from Mr. Untracht's office, including those for Shiroyama and Resurgence.

40.    As the Defendants have now admitted, Shiroyama and Resurgence held only funds transferred by or contributed from Greg and Sharon Hawkins.  The removal of their personal social security numbers was an overt act in the furtherance of the fraud and conspiracy alleged herein.

41.    Mr. Hawkins made similar representations during his telephone conversations with Brad Daniel in June, 1999 regarding the remaining three (3) LLCs.  Campenile, LLC had two hundred thirty-four thousand five hundred twenty-eight ($234,528.00) dollars of Ms. Hawkins' MedApproach investment assigned to it; River Valley, LLC, six hundred twenty-five thousand four hundred forty-four ($625,440.00) dollars; and West Fork, LLC eight hundred ninety-nine thousand forty ($899,040.00) dollars.

42.    Transfers from Ms. Hawkins to Campenile, River Valley and West Fork were made on June 14, 1999, the same day as the Shiroyama transfer.  Mr. Hawkins represented in the same June, 1999 conversations with Brad Daniel that these funds were all, as in the case of Shiroyama, "sweeteners" to which he would have no further claim and that it was necessary for him to "surrender" the funds in order to induce others to invest through these entities.  In each

case, the representations of Greg Hawkins caused Mr. Daniel and Bio-Pharm to permit Sharon Hawkins' interests to be transferred, with her consent.

43.     As a consequence of the purchase of the controlling interest in the Project the structure of MedApproach, L.P. was reorganized in December, 1999, with effective commencement dates as of January 1, 1999.  Pursuant to this reorganization Med Approach, L.P. ("Old MedApproach"), was dissolved and the assets, liabilities, rights and legal obligations were transferred to three new separate limited partnerships that were formed under Delaware law: MedApproach, L.P. ("New MedApproach"), DIG Equity, LP and DIG Special Assets, L.P. MedApproach Holdings, Inc. (MAH) was formed for the specific purpose of becoming the general partner in all three new partnerships as successor to Bio-Pharm.

44.     The assets and liabilities, rights and obligations of Old MedApproach and its limited partners were transferred by the consent of all, including Gregory and Sharon Hawkins. The rights, duties and responsibilities of Bio-Pharm Investments, Inc., were transferred to and undertaken by MedApproach Holdings, Inc.  To these actions Greg Hawkins personally agreed and Sharon Hawkins consented in writing.

45.     Pursuant to these agreements, MAH is entitled to a 1% annual management fee together with a 10% profit participation fee of all distributions payable to New MedApproach partners and a 20% of profit participation fee of all distributions payable to DIG Equity, L.P.'s limited partners, after return of capital.

46.     The Project produced sufficient revenue to begin repayment of capital in 2003. By July, 2010, all contributed capital had been returned to each limited partner.  The annual management fees for the general partner had been deferred.  Thus in July, 2010, profit

participations were available for the first time, and the accrued MAH management fees were due for the first time.

47.      Because the time for distributions had come, Mr. Daniel asked for a confirmation or explanation of the Hawkins' interests by electronic mail to Mr. Hawkins on July 12, 2010. Mr. Hawkins failed to respond and Mr. Daniel emailed him again on July 27, 2010.

48.      Mr. Daniel again requested verification of interests by letter to Mr. and Mrs. Hawkins on Friday, December 3, 2010.  On Monday, December 6, 2010, Mr. Hawkins called Mr. Daniel at his residence in Nashville, TN.  Mr. Hawkins was angry.  Referring to Shiroyama, he said heatedly that the investor "is still a priest.  You are never going to find out who he is, and it is none of your business!"

49.      On December 10, 2010, Mr. Hawkins, having regained his composure, called Mr. Daniel again, twice.  Mr. Daniel took the first call in the parking lot at the J. Alexander's restaurant on White Bridge Road in Nashville, TN.  The second call was taken in the Walgreen's parking lot on Harding Place in Nashville, TN.  Mr. Hawkins told Mr. Daniel that he would not provide any documentation concerning the transfers and investors, but that neither the "priest" nor the other investors were "him."  Remarkably, Mr. Hawkins suggested that he would consider paying some amount of money in lieu of providing documentation.

50.      After a letter from Mr. Daniel's attorney, Mr. Daniel and Mr. Hawkins spoke by telephone on December 21, 2011.  Greg Hawkins admitted for the first time that Sharon Hawkins owned all of Resurgence, LLC, and that "maybe" he did owe fees to MAH from Resurgence.  He still falsely maintained, however, that the owner of Shiroyama was a priest. The Resurgence investments had been made on February 2, 2000 in the amount of five hundred

thousand ($500,000) dollars and August 29, 2000 in the amount of two hundred thousand ($200,000) dollars.

51.     In his "certification" filed in this matter on July 30, 2012 (#170), Mr. Hawkins stated in ¶ 21:  "In 2000, I formed Resurgence, LLC, as a Delaware, LLC, through which my wife Sharon invested approximately seven hundred thousand ($700,000) dollars."

52.     In ¶ 18 of his "Certification" of July 30, 2012, Mr. Hawkins referred to funds that had been assigned to his wife.  "I transferred to each of the six (6) [investors] a prorate  share of three million ($3,000,000) dollars of my existing investment.  Thus, I was required to forfeit a large portion of my investment in order to save the Project."  In ¶ 20, he claims, "one of my friends who had agreed to invest back[ed] out of his commitment.  Thus, I was required to fund personally an additional investment of approximately three hundred fifty thousand ($350,000) dollars through the LLC call Shiroyama." (*Emphasis Added*)

53.     The three hundred fifty thousand ($350,000) dollars Shiroyama investment was made on June 10, 1999.  The transfer of three hundred twenty thousand ($320,000) dollars of Sharon Hawkins' interest was made on June 14, 1999.  Thus the "backing out" of the mystery clergyman, if Mr. Hawkins is to be believed, preceded the transfer of interests and coincided with his false representation, the truth of which he insisted upon until this lawsuit was commenced.   He also placed through Shiroyama an additional three hundred forty-three thousand eight hundred seventy-six dollars seventy-one ($343,876.71) cents on February 10, 2000 and two hundred fifty thousand ($250,000) on September 21, 2000, all his money and all under the fraudulent representation to Brad Daniel that he had no personal interest in Shiroyama.

54.     It is not a coincidence that the investments purportedly made by Sharon Hawkins through Resurgence, LLC, were on February 2, 2000 (five hundred thousand ($500,000) dollars, eight days prior to the three hundred fifty thousand ($350,000) dollar payment) and August 29, 2000 (two hundred thousand ($200,000) dollars), less than a month prior to the last Shiroyama payment).

55.     Brad Daniel on behalf of MAH permitted this investment by Sharon Hawkins based on Greg Hawkins' false statement on her behalf that none of the money used was that of Greg or Sharon Hawkins, nor would the investment benefit himself or his wife.

56.     In ¶ 20 of his "Certification," Greg Hawkins admitted that he had "personally" invested three hundred twenty thousand ($320,000) dollars in Shiroyama because an investor had "back[ed] out."  This admission was made after the filing of this lawsuit.  At no time since June, 1999, had Greg or Sharon Hawkins previously admitted that Shiroyama was funded with their own money.

## FRAUDULENT CONCEALMENT

57.     Based upon the foregoing facts, Mr. and Mrs. Hawkins took affirmative action to conceal from MAH its cause of action, of which they were aware, or remained silent and failed to disclose material facts despite having a duty to do so.  Plaintiff could not have learned of its cause of action despite exercising reasonable care and diligence because all of the true information was in the custody and control of Mr. and Mrs. Hawkins (or their accountant), who refused to provide it despite repeated requests.

## EQUITABLE ESTOPPEL

58.     MAH asked Mr. Hawkins in 2010 when funds were available to pay deferred management fees and profit participations to confirm his continued lack of personal ownership

or benefit from the five (5) Limited Liability Companies. He continued to insist falsely that this was true. He is therefore equitably stopped from any reliance on any statute of limitations, were one otherwise to apply.

## THE FRAUDULENT SCHEME
## Greg Hawkins
## Shiroyama And Resurgence

59.     Greg Hawkins always understood and agreed that Brad Daniel controlled all investments in the Project through his ownership of the general partner, MAH. He knew that Mr. Daniel and MAH were to be compensated through management and participation fees.

60.     Greg and Sharon Hawkins knew that any transfer or reallocation of funds from MAH control would deprive MAH of its fees and that those fees would therefore remain the property of Shiroyama and Resurgence, both of which the Hawkins family owned.

61.     After the failure of LTCM, Greg and Sharon Hawkins had diminished assets but were not "broke." They owned in 1999 and still own expensive property at Oak Island, Premium Point in New Rochelle, NY. They own and race horses. They placed at least one million six hundred forty-three thousand five hundred seventy-seven ($1,643,577) dollars in Shiroyama and Resurgence. Because the collapse of LTCM deprived the Hawkins of a significant part of their wealth, however, they were motivated to preserve such assets as survived that unfortunate event. Retaining hundreds of thousands of dollars in Danco earnings which would otherwise pass to MAH was one means to do so.

62.     Greg Hawkins repeatedly told Brad Daniel that he was "broke" in order to persuade him that new outside investments should be sought because Mr. Hawkins might not be financially able to meet his back-stop commitment.

63.     Greg Hawkins knew that Brad Daniel's consent was required and that the transfers of interests would eventually diminish Mr. Daniel's and MAH's returns on the Project. In order to induce Mr. Daniel to agree, Mr. Hawkins pretended to forego his own and his wife's profits as well. He represented the Shiroyama transfer as a sacrifice he himself was making to "sweeten" the deal for the non-existent "priest."

64.     When seven hundred thousand ($700,000) dollars were invested through Resurgence, now admitted to be an LLC which Greg Hawkins formed and made Sharon Hawkins the owner, Greg Hawkins falsely claimed that neither he nor Sharon had any interest because if he had been truthful, Mr. Daniel would have required the investment through MAH. This detrimental reliance will, if not remedied, cost MAH in excess of a million dollars in fees.

## Westfork, Campenile and River Valley

65.     Mr. Daniel agreed to transfer Mr. Hawkins' interests into Westfork, Campenile and River Valley because of the same fraudulent misrepresentations made regarding Greg Hawkins' inability to contribute more capital to the Project because he was "broke" and he needed to attract new investors through "sweeteners."

66.     Had Mr. Daniel truthfully been told that the approximately one million six hundred thousand ($1,600,000) dollars in "new" money invested through Shiroyama and Resurgence were in reality the funds of Greg and Sharon Hawkins, he would not have consented. He would have retained all the interests transferred and required that Greg and Sharon Hawkins provide any "sweeteners" from those funds falsely hidden by them in Shiroyama and Resurgence.

67.     Facing potential ruin, Greg Hawkins first transferred his interests to his wife and beyond the reach of his creditors. Within a year and a half, Mr. Hawkins had sheltered nearly

17

two million ($2,000,000) dollars in his wife's name from both his personal creditors and the fee entitlements of MAH. He accomplished this by the pattern of false and intentionally misleading statements described in this Complaint.

68. Brad Daniel relied upon the truth of the statements. Unless this Court provides a remedy, MAH will lose in excess of a million dollars of fees to which it would otherwise be entitled, over the life of this project.

69. When discovery provides the information which Greg Hawkins has, prior to the filing of this lawsuit, refused to supply, if that information demonstrates that none of the funds of Campenile, River Valley and West Fork, inure to the benefit of Greg and Sharon Hawkins, then those funds contributed by outside investors will not be subject to MAH fees. Should those investments prove to be of a feather with Shiroyama and Resurgence, however, then plaintiff will seek fees from all of the investments so revealed. And if the "sweeteners" in fact, by agreement between or among Greg and Sharon Hawkins and such outside investors in fact inure to their benefit due to some ownership retention by one or both of them or otherwise, then this will present a second basis for charging fees against the transferred amounts.

## LIABILITY OF SHARON HAWKINS

70. As alleged, supra, Greg Hawkins transferred his interest to his wife Sharon Hawkins in July, 1998 at a time in which the failure of LTCM was imminent. In the fall of 1998, Greg Hawkins sought on behalf of Sharon Hawkins to reduce her exposure under the Amended and Restated Funding Commitment to a set-off from her interests.

71. All communications thereafter requesting the transfer of interests to the five (5) Delaware, LLCs and the acceptance of seven hundred thousand ($700,000) dollars from Resurgence were made by Greg Hawkins on behalf of Sharon Hawkins and specifically required

the transfer of funds allocated to her on the books. When the tax identification number for Resurgence was supplied to Marjorie Soifer, a bookkeeper for MAH, on February 2, 2001, Sharon Hawkins' personal social security number was listed for Resurgence. Mr. Untracht, who represented them both, supplied new numbers on February 27, 2001.

72. Greg and Sharon Hawkins are presently and at all times material hereto have been, husband and wife and citizens and residents of the State of New York. New York is a community property state.

73. Thus Greg and Sharon Hawkins acted on behalf and for the benefit of the other in each transaction described in this Complaint. The fraudulent scheme of Greg Hawkins to insulate his funds in his wife's name and to retain fees due to MAH by false representations of fact were made by Greg Hawkins on behalf of Sharon Hawkins, and Sharon Hawkins accepted and seeks to continue to accept the benefit of the fraud. Each transfer of interests and acceptance of new investments required the participation of Sharon Hawkins.

74. Sharon Hawkins has not denied that Greg Hawkins spoke or acted on her behalf. She admits, for example, that Greg Hawkins formed Resurgence, that she become its owner and that "she" invested seven hundred thousand ($700,000) dollars of "her" money into it. Sharon Hawkins will enjoy the benefit of the fraud if MAH is deprived of its fees.

75. Greg and Sharon Hawkins therefore acted each as the agent of the other in all representations and transactions described herein.

## CIVIL CONSPIRACY

76. Greg and Sharon Hawkins had a common design to shelter interests in the Project from the fees to which MAH was entitled under the partnership agreements. This design was accomplished by the false and fraudulent statements of Greg Hawkins, which resulted in the

19

placement of interests in entities created by Greg Hawkins, to be held in Sharon Hawkins' name, with her knowledge and consent and the concealment of these interests by them. The scheme by its nature could not have been accomplished without the participation and consent of both.

77.     The misrepresentations of Greg Hawkins, the formation of LLCs, the acceptance of ownership's interests in the Project and in Shiroyama and Resurgence by Sharon Hawkins based upon the false statements are overt acts in furtherance of this conspiracy.

78.     The loss of management and participation fees by MAH beginning in July, 2010 are the proximate result of this conspiracy, the underlying tort of which is fraud.

## BREACH OF CONTRACT

79.     Gregory Hawkins was invited to invest in the Project by Brad Daniel under the understanding that all investments would be made through Bio-Pharm and its successors in interest. Mr. Hawkins knew this because he was familiar with the business and how those who raised funds were paid. He was introduced through a relative of Mr. Daniel, who was also an investor through Bio-Pharm.

80.     Tennessee law specifically provides that agreements may be inferred from the conduct of the parties, even in the absence of a written agreement. Over fifty (50) persons invested in the Project. Those who were introduced by Mr. Daniel in every instance invested through Bio-Pharm and its successor, including Greg Hawkins.

81.     Greg Hawkins sought permission from Brad Daniel to transfer his interests to his wife because he understood the agreement and the partnership agreements required permission of the General Partner. Sharon Hawkins' agreement to assume the duties of her husband presumed

the agreement to invest only through MAH, and her conduct thereafter serves as a ratification thereof.

82.     The fraud alleged herein was used in part to induce MAH and Mr. Daniel to accept investors outside MAH because Mr. Hawkins knew that this was his agreement and that MAH had no obligation to accept investors directly into Danco.

83.     The true source of the Resurgence investment, Sharon Hawkins, was concealed from MAH and Mr. Daniel because both Greg and Sharon Hawkins knew of the agreement and sought to avoid it.   Each investment made outside of MAH by Greg and Sharon Hawkins constituted a breach of the agreement.   MAH beginning in July, 2010, has suffered losses that were in the contemplation of the parties when the understanding was reached.

**WHEREFORE**, Plaintiff prays:

1.     That the Court declare pursuant to 28 U.S.C. § 2201 and Rule 57, Fed. R. Civ. Proc., Plaintiff's entitlement to a set-aside of funds with respect to the five Delaware LLCs, and that retention of these funds is both lawful and in accordance   with agreements among the parties;  and that future distributions be likewise subject to set-aside;

2.     That the Defendants be required to account for each and every investment, the source thereof, and the dates of each investment related to the Project;

3.     That the proper accounting sought herein be had through an appointment of a Special Master to determine these facts as provided in Rule 53, Fed. R. Civ. Proc.;

4.     That Plaintiff be awarded judgment from and against the Defendants in an amount equal to all funds diverted from MedApproach, L.P. and DIG Equity, L.P. through these means;

21

5.     That Plaintiff  be awarded such additional punitive damages to which the Court may deem it to be entitled because of the fraud perpetrated on the Plaintiff by the Defendants, jointly and severally; and,

6.     Plaintiff be awarded such additional general relief to which this Court may deem it to be entitled.


Respectfully submitted,


/s/ Gary Blackburn
**THE  BLACKBURN FIRM, PLLC**
W. Gary Blackburn (#3484)
213 Fifth Avenue North, Suite 300
Nashville, TN  37203
Tel: (615) 254-7770
Fax: (866) 895-7272
*Attorney for Plaintiff*


## CERTIFICATE OF SERVICE

I certify that a true and exact copy of the *[Second Proposed] Second Amended Complaint* has been served via electronic mail, on the following:

R. Scott Thompson                    William T. Ramsey
65 Livingston Avenue                 2000 One Nashville Place
Roseland, NJ 07068                   150 Fourth Avenue North
Tel.:  (973) 597-2532                Nashville, TN 37219
Fax:  (973) 597-2533                 Tel.:  (615) 244-1713
                                     Fax:  (615) 726-0573


This the 30th day of *January*, 2013.


/s/ Gary Blackburn
W. Gary Blackburn