| | | |
|---|---|---|
| **MEDAPPROACH HOLDINGS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 3:11-cv-1199** |
| | ) | **Judge Trauger** |
| **v.** | ) | |
| | ) | |
| **GREGORY D. HAWKINS and** | ) | |
| **SHARON HAWKINS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the court is the Defendants' Motion to Dismiss (Docket No. 55), to which

the plaintiff has responded (Docket No. 59), and the defendants have filed a reply (Docket No.

62). For the reasons discussed herein, the defendants' motion will be granted in part and denied

in part.

## BACKGROUND

### I.      Introduction

The plaintiff, MedApproach Holdings, Inc. ("MAH"), is a Delaware corporation that is

the general partner of MedApproach, L.P. ("MedApproach"), a Delaware limited partnership.

(Docket No. 53 ¶ 1.) Both MAH and MedApproach maintain their principal place of business in

Nashville, Tennessee. (*Id.*) MedApproach has served and continues to serve as a vehicle through

which investments have been made to fund a project to manufacture and distribute a controversial

pharmaceutical drug named mifepristone in the United States ("the Project").[1] (Docket No. 53 ¶¶ 5, 7-8; Docket No. 34 at 1.) The defendants, Gregory and Sharon Hawkins, are New York State residents who invested in the Project through MedApproach. (Docket No. 53 ¶ 2.)

In this suit, MAH alleges that the defendants conspired to fraudulently induce it to assign their interests that were already invested in MedApproach to other corporate entities created by Mr. Hawkins that directly invested into the Project. The purpose of this alleged scheme, which involved material misrepresentations of fact by Mr. Hawkins to MAH's sole member, Mr. Bradley Daniel, was to avoid paying MAH certain profit participation and management fees that otherwise attached to investments in the Project made through MedApproach. MAH also alleges that, by virtue of this scheme, the defendants breached a contractual obligation to place their investments in the Project solely through those entities controlled by Mr. Daniel.

This is the third attempt by the plaintiff to allege claims for fraud, civil conspiracy, and breach of contract. After commencing this action on December 20, 2011, MAH amended its Complaint on July 6, 2012. (Docket No. 26.) Shortly thereafter, the defendants moved to dismiss the Amended Complaint, contending that it failed to allege fraud with the requisite particularity pursuant to Federal Rule of Civil Procedure 9(b) and did not otherwise state claims for civil conspiracy or breach of contract. (Docket No. 34 at 5-6, 13, 17-18.) The court granted the defendants' motion in a Memorandum Opinion issued on December 17, 2012. (Docket No. 47.) In doing so, it dismissed MAH's claims without prejudice and gave it until January 14, 2013 to seek leave to amend. (*Id.* at 17.) After receiving two extensions of this deadline, MAH filed

---

[1] The defendants have previously represented that mifepristone is a drug used to induce abortions. (Docket No. 34 at 2.)

its [Second Proposed] Amended Complaint ("2AC") on January 30, 2013, which attempts to plead fraud with greater particularity and to set forth additional factual allegations supporting its civil conspiracy and breach of contract claims.  (Docket No. 53.)

## II.     Factual Allegations of the 2AC

The parties' business relationship commenced in 1995, when Mr. Daniel, on behalf of Bio-Pharm Investments, Inc. ("Bio-Pharm"), MAH's corporate predecessor, approached Mr. Hawkins to gauge his interest in investing in the Project through MedApproach.[2]  On May 4, 1995, Mr. Hawkins executed a letter agreement with Bio-Pharm concerning his receipt of materials to evaluate the Project before making an investment decision.[3]  (Docket No. 34-3.) That agreement provided, among other things, that, "[i]n the event that a Transaction [i.e., an investment by Mr. Hawkins in the Project through Bio-Pharm or an entity in which it has an interest] is not consummated, neither [he nor his representatives] shall, without the prior written consent of Bio-Pharm, use any of the Evaluation Material for any purpose, or invest in Akcess [the company operating the Project] or its affiliates."  (*Id.*)

---

[2] Unless otherwise noted, the factual allegations are drawn from the plaintiff's [Second Proposed] Amended Complaint ("2AC") (Docket No. 53).  Because significant portions of this document overlap with the factual allegations contained in the prior Amended Complaint, a substantial portion of the content from this section is reproduced (with some alterations) from the court's prior Memorandum Opinion granting the defendants' first Motion to Dismiss (Docket No. 47).

[3] A copy of this letter agreement was attached to the defendants' first Motion to Dismiss. (*See* Docket No. 34-3.)  In its prior Memorandum Opinion granting the defendants' motion, the court noted that it could consider the exhibit, since "it is central to MAH's allegation that the defendants breached their obligations to invest funds in the [Project] through MedApproach." (*See* Docket No. 47 at 2, n. 2) (citing *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997)). Moreover, the court pointed out that the plaintiff had raised no objections to the authenticity or relevance of the attached exhibit.  (Docket No. 47 at 2, n. 2) (citing *Mediacom Se. LLC v. BellSouth Telecomms., Inc.*, 672 F.3d 396, 400 (6th Cir. 2012)).

On December 21, 1995, Mr. Hawkins executed a Subscription Agreement with MedApproach. Under this agreement, Mr. Hawkins agreed to invest $1 million in MedApproach as a limited partner. A second Subscription Agreement was executed by Mr. Hawkins on June 28, 1996, whereby another $500,000 was invested in the limited partnership. Prior to February 1997, these investments were paid directly to MedApproach for the purpose of creating limited partnership interests. According to the 2AC, one of the purposes of this arrangement was to shield the identity of investors in light of the Project's controversial nature.

As MedApproach's general partner, Bio-Pharm earned its compensation through management and profit participation fees. Specifically, it charged a 1% annual management fee as well as a 20% profit participation fee on all distributions made by MedApproach after the return of capital to investors. The plaintiff alleges that this fee arrangement is common and customary in the investment world and that, in any event, Mr. Hawkins agreed to the arrangement in writing.

MedApproach acquired control of the Project in February 1997. In connection with this acquisition, Mr. Hawkins, along with two other investors, executed an agreement ("the Back-Stop Liability Agreement") on February 4, 1997, wherein he agreed, among other things, to pay for certain obligations undertaken by MedApproach in connection with its acquisition. This back-stop liability included, among other things, the obligation to purchase, through a rescission offer, the limited partnership interests of those investors who had been attracted to the Project by its previous owner. Mr. Hawkins agreed to make such payments to and on behalf of MedApproach. Pursuant to the Back-Stop Liability Agreement, Mr. Hawkins paid $3.5 million

to MedApproach, a sum equal to the amount which was to be paid to the Project's original owner through the acquisition agreement.

On February 12, 1997, Mr. Hawkins executed a Funding Commitment to guarantee that adequate funds were available to MedApproach to acquire a controlling interest in the Project. An Amended and Restated Funding Commitment was executed on April 30, 1998, wherein Mr. Hawkins agreed to fund MedApproach's obligations up to a total of $13,717,672.00. In a letter agreement executed on May 28, 1998, Mr. Hawkins agreed that, in the event his obligations under the Amended and Restated Funding Commitment were called upon, he would make a capital contribution to Medapproach in an amount necessary to satisfy both his and MedApproach's obligations under that commitment.

Sometime during the second-half of 1998, Mr. Hawkins suffered financial difficulties precipitated by the collapse of Long-Term Capital Management, L.P. ("Long-Term"), a hedge fund of which he was a principal. By the end of the second quarter of 1998, he had invested $7.4 million in MedApproach. He is alleged to have invested only $75,000 in the limited partnership thereafter.

On July 2, 1998, Mr. Hawkins assigned his limited partnership interest and obligations in MedApproach to his wife, Sharon Hawkins. Mr. Daniel, as the controlling member of Bio-Pharm, MedApproach's general partner, consented to this assignment. Greg Hawkins, allegedly acting on his wife's behalf, later requested Mr. Daniel to limit any recourse against Mrs. Hawkins to a set-off against the interest assigned. Mr. Daniel agreed to this arrangement by way of a letter agreement executed on November 9, 1998.

Beginning in July 1998, Greg Hawkins began to tell Mr. Daniel that he was experiencing liquidity problems due to financial conditions at Long-Term.  He specifically informed Mr. Daniel that, as a result of Long-Term's difficulties, he would have little to no funds available to invest in MedApproach.  In September 1998, when Long-Term's impending collapse was public knowledge, Mr. Hawkins told Mr. Daniel that he was losing his assets, going "broke," and no longer had the financial resources to invest much more money in MedApproach.

During the first half of 1999, Greg Hawkins and Mr. Daniel had weekly telephone conversations where, among the topics of discussion, were several limited liability companies created at Mr. Hawkins' behest.  According to the 2AC, Mr. Hawkins told Mr. Daniel during these conversations that neither he nor his wife owned any interests in any of the LLCs and would not benefit directly from them.  In a separate telephone conversation in June 1999, Mr. Hawkins told Mr. Daniel that he was "broke."

The closing date for the rescission offer pertaining to MedApproach's February 1997 acquisition was June 14, 1999.  On the same date, Mr. Hawkins is alleged to have transmitted a facsimile to Mr. Daniel, enclosing a handwritten chart depicting how he wanted portions of his wife's MedApproach interest to be assigned to the aforementioned LLCs.  Contemporaneously with this request, Mr. Hawkins called Mr. Daniel to inform him that, in light of his liquidity problems, he needed to transfer approximately $3 million of his wife's interest in MedApproach to the various LLCs in order to entice new investors into the Project.

Specifically, Mr. Hawkins requested that Mr. Daniel approve the assignment of $320,000 of Sharon Hawkins' interest in MedApproach to an entity called Shiroyama, LLC ("Shiroyama"). In making this request, Mr. Hawkins is alleged to have made the following representations: (1) neither he nor his wife owned any interest in Shiroyama or would directly benefit from its

activities; (2) the true investor in Shiroyama was a Catholic priest who wished to maintain absolute confidentiality; (3) the $320,000 in Mrs. Hawkins' interest was a "sweetener" to induce a much larger investment from this outside investor in the sum of $1,263,877; and (4) that he was surrendering this interest to raise money for the Project.

Based on these representations, Mr. Daniel, acting on behalf of Bio-Pharm, agreed to the Shiroyama assignment on June 14, 1999. Having served as the chairperson of the Project's Board of Directors at all relevant times, Mr. Daniel also accepted direct investments into the project from Shiroyama on June 10 1999, February 10, 2000, and September 21, 2000 totaling $943,876.71. According to the 2AC, Mr. Hawkins' representations were false. No priest ever invested in Shiroyama. Instead, the putatively "broke" Mr. Hawkins and his wife contributed all of the funds to the LLC. It further alleges that, in the absence of these false representations, Daniel would have withheld his consent to: (1) the assignment of a portion of Mrs. Hawkins' MedApproach interest; and (2) the direct investments of new funds made into the Project by Shiroyama. As a result of Mr. Hawkins' false representations, MAH alleges that it has been deprived of profit participation and management fees.

On the same date, Mr. Daniel also agreed, on behalf of Bio-Pharm, to assign varying portions of Sharon Hawkins' interest in MedApproach to three other LLCs: Campenile, LLC ("Campenile") ($234,528); River Valley, LLC ("River Valley") ($625,440); and West Fork, LLC ("West Fork") ($899,040). Mr. Daniel is alleged to have offered his consent based on similar representations made by Mr. Hawkins. Specifically, the 2AC alleges that Mr. Hawkins told Mr. Daniel that the assignments would serve as "sweeteners" to which he was foregoing any personal interest. It similarly alleges that, as a result of Mr. Hawkins' false representations, MAH has lost profit participation and management fees.

Following these assignments, Mr. Hawkins caused a fifth limited liability entity, Resurgence, LLC ("Resurgence"), to be created. This entity is wholly-owned by Mrs. Hawkins and made investments directly into the Project on February 2, 2000 and August 29, 2000 totaling $700,000. The 2AC alleges that Mr. Daniel detrimentally relied upon Mr. Hawkins' false representation regarding Resurgence's ownership by allowing it to make direct investments into the Project free and clear of MAH's profit participation and management fees.

In December of 1999, MedApproach underwent a reorganization, retroactively effective January 1, 1999. Specifically, the preexisting MedApproach entity was dissolved and its assets, liabilities, rights, and legal obligations were transferred to three new Delaware limited partnerships created in its stead: MedApproach, L.P. ("new MedApproach"); DIG Equity L.P. ("DIG Equity"); and DIG Special Assets, L.P. ("DIG Special Assets"). DIG Special Assets held a limited partnership interest in Danco Investors Group, L.P. ("Danco Investors Group").[4] (Docket No. 63-1 at 2.) Danco Investors Group and its predecessor served as the sole owner of Danco Laboratories, LLC, which was the operating entity that manufactured, marketed, and distributed mifepristone in the United States. (*Id.*) The reorganization also led to the formation

_____

[4] This information appears in a December 9, 1999 letter from Mr. Daniel to Mrs. Hawkins summarizing the reorganization. The letter is referenced in the 2AC as an exhibit (*See* Docket No. 53 ¶ 6), but it appears that the plaintiff inadvertently failed to attach it while filing the 2AC. However, the defendants attached a copy of the letter as an exhibit to their reply brief. (Docket No. 63-1.) Because the plaintiff has not contested the authenticity of the defendants' exhibit, the court will consider it in the course of ruling upon the pending motion. *See Weiner*, 108 F.3d at 89 ("[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim") (internal quotation marks and citations omitted); *Mediacom Se. LLC*, 672 F.3d at 400 ("While documents integral to the complaint may be relied upon, even if they are not attached or incorporated by reference, it must also be clear that there exist no material disputed issues of fact regarding the relevance of the document") (internal quotation marks, citations, and alterations omitted).

of MAH, Bio-Pharm's successor, who served as the general partner to all three of the newly created limited partnership entities. MAH specifically assumed Bio-Pharm's rights, duties, and responsibilities. Both defendants are alleged to have consented to the reorganization.

According to the agreements that were executed during the reorganization, MAH was entitled to a 1% annual management fee, along with a 10% profit participation fee of all distributions payable to new MedApproach's limited partners after the return of capital. As for distributions payable to the limited partners of DIG Equity, the profit participation fee was 20%. MAH was not entitled to a profit participation fee on distributions payable from DIG Special Assets.[5] (Docket No. 63-1 at 7.) After all contributed capital had been returned to each limited partner in July of 2010, MAH's accrued management fees (which had previously been deferred) and profit participation fees became due for the first time.

In July 2010, Mr. Daniel unsuccessfully attempted to obtain an explanation from the Hawkins' regarding their interests. On December 3, 2010, he wrote a letter to Greg and Sharon Hawkins requesting a verification of their interests. In response to this letter, Mr. Hawkins insisted that the investor in Shiroyama was still a priest and that he (Mr. Hawkins) continued to hold no interest in the other LLCs to which portions of Sharon Hawkins' MedApproach interest were assigned. According to the 2AC, Mr. Hawkins refused to provide any documents concerning either the assignments or the identity of the true investors and even suggested that he would consider paying money in lieu of providing documentation.

---

[5] This information also appears in the aforementioned December 9, 1999 letter from Mr. Daniel to Mrs. Hawkins summarizing the reorganization. The court has already determined that it may consider this document while ruling upon the pending motion. *See supra* n. 4.

On December 21, 2011 (the day after this action was commenced), Mr. Hawkins is alleged to have told Mr. Daniel in a telephone conversation that Resurgence was wholly-owned by Sharon Hawkins. On July 30, 2012, Mr. Hawkins executed a Certification in this case, stating that he was required to personally invest $350,000 into Shiroyama after his friend backed out of his initial investment commitment due to the fear of publicity and retribution from anti-abortion groups. (Docket No. 32-5 ¶ 20.)

### III.    Relevant Procedural History

As previously discussed, the court had given MAH until January 14, 2013 to file a motion seeking leave to amend. (Docket No. 47 at 17.) After receiving from the court two extensions to this deadline, MAH filed its [Proposed Second] Amended Complaint on January 30, 2013 without the accompanying moving papers. (Docket No. 53.) In an Order issued on February 5, 2013, the court stated that it would consider MAH's first request to extend the January 14, 2013 filing deadline as the required Motion to Amend. (Docket No. 54.) However, instead of filing a response in opposition, the defendants submitted the pending motion seeking dismissal of all of the claims in the [Proposed Second] Amended Complaint. (Docket No. 55.) By filing this motion, the defendants essentially contend that leave to amend should be denied on the grounds of futility. *See Midkiff v. Adams Cnty. Reg'l Water Dist.*, 409 F.3d 758, 767 (6th Cir. 2005) (noting that "[a] motion for leave to amend may be denied for futility if the court concludes that the pleading as amended could not withstand a motion to dismiss") (internal quotation marks omitted). In any event, the Motion to Dismiss has been fully briefed by the parties and is ripe for review.

## **ANALYSIS**

The defendants have moved for dismissal of MAH's [Second Proposed] Amended Complaint ("2AC") on the grounds that the court lacks subject matter jurisdiction to entertain this lawsuit pursuant to Federal Rule of Civil Procedure 12(b)(1) and that the 2AC otherwise fails to state claims upon which relief can be granted pursuant to Rule 12(b)(6).

## I.   Motion to Dismiss for Lack of Subject Matter Jurisdiction

At the outset, the defendants seek dismissal of the 2AC under Federal Rule of Civil Procedure 12(b)(1), arguing that the court lacks subject matter jurisdiction to entertain this suit. (Docket No. 56 at 8.)  The defendants argue that dismissal of the entire suit is appropriate because the 2AC only states a cause of action for declaratory judgment and that MAH has failed to allege factual content showing that it faces a threat of imminent coercive action by the defendants.  (*Id.*)  Before delving into the merits of the defendants' argument, the court will first address what causes of action are actually alleged in the 2AC.

It is true that the 2AC broadly alleges in its jurisdictional statement that this suit requests the court "to declare the rights and legal relations of the parties as described hereafter."  (Docket No. 53 ¶ 3.)  Specifically, it requests the court to declare:

> Plaintiff's entitlement to a set-aside of funds with respect to the five Delaware LLCs, and that retention of these funds is both lawful and in accordance with agreements among the parties; and that future distributions be likewise subject to set-aside.

(*Id.* Prayer for Relief ¶ 1.)  Nevertheless, a reasonable reading of the 2AC reveals that, at its core, it alleges substantive causes of action for breach of contract, fraud, and civil conspiracy.  The 2AC invokes the court's diversity jurisdiction to assert each of these three claims.  (*Id.* ¶ 3.)  It also seeks compensatory and punitive damages stemming from the defendants' conduct.  (*Id.* Prayer for Relief ¶¶ 4-5.)  While, unlike the previously dismissed Amended Complaint, the 2AC

inexplicably fails to set forth these claims as separate causes of action, it nonetheless refers to each of them under separate headings. (*See* Docket No. 53 ¶¶ 59-69, 76-83.) To accept the defendants' contention concerning the scope of the 2AC would be to accept form over substance. Indeed, in the court's view, the 2AC's request for declaratory relief complements the other substantive causes of action pled therein. Thus, the defendants' argument seeking dismissal of this entire suit on jurisdictional grounds is without merit.

What remains, then, is the issue of whether the defendants are nevertheless entitled to dismissal of MAH's request for declaratory relief. The Declaratory Judgment Act states that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . *may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a) (emphasis added). The Sixth Circuit has enumerated a list of factors that district courts should consider when evaluating whether to hear a declaratory judgment claim. *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984). These factors include:

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of 'procedural fencing' or 'to provide an arena for a race for res judicata;' (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*Id.*

MAH asserts that "[t]he essence of this dispute is the entitlement of plaintiff to management and profit participation fees from the earnings of the Project." (Docket No. 59 at

20.)  It adds that this issue should be resolved through a declaration from the court.  (*Id.* at 21.)

However, even assuming that a declaratory judgment concerning the plaintiff's right to fees

would settle the controversy between the parties, it would serve no useful purpose under the

present circumstances, where the plaintiff has already asserted coercive causes of action aimed at

redressing the harm caused by the defendants' past conduct.  *See AmSouth Bank v. Dale*, 386

F.3d 763, 786 (6th Cir. 2004) ("The 'useful purpose' served by the declaratory judgment action is

the clarification of legal duties for the future, rather than the past harm a coercive tort action is

aimed at redressing").   Indeed, the loss of profit participation and management fees constitutes

the alleged injury underlying the substantive contract and fraud claims already present in this

case.  It thus follows that a critical issue in resolving each of these substantive claims will be the

plaintiff's entitlement to such fees.  In other words, the question of the plaintiff's right to its

associated fees will necessarily be resolved during the course of litigating the substantive claims

in this lawsuit.  Thus, given the traditional causes of action MAH has already asserted to

vindicate its legal rights, the court finds that providing the requested declaratory relief here would

serve no useful purpose.  *See Dale*, 386 F.3d at 787 ("Where a pending coercive action . . . would

encompass all the issues in the declaratory judgment action, the policy reasons underlying the

creation of the extraordinary remedy of declaratory judgment are not present, and the use of that

remedy is unjustified").   MAH's request for declaratory judgment will therefore be dismissed.[6]

## II.     Motion to Dismiss for Failure to State a Claim

---

[6] The court finds that the third and fourth factors of the *Grand Trunk* test, concerning
procedural fencing and friction with state courts, are not applicable here.  In addition, the fifth
factor, the existence of a better or more effective alternative remedy, is not particularly
dispositive.  The existence of an alternative remedy (namely, the other coercive causes of action)
is important not because it is necessarily better or more effective, but rather because it shows that
providing a declaratory judgment under these circumstances would serve no useful purpose.

## A.       Standard of Review

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)). The court must determine whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

## B.       Breach of Contract

The defendants first argue that MAH has failed to state a claim for breach of contract. (Docket No. 56 at 13.) In advancing this argument, they contend that the 2AC's allegations concerning the existence of an implied contract between Greg Hawkins and MAH, wherein Mr.

Hawkins agreed to only invest funds in the Project through an entity controlled by Bradley Daniel, are virtually identical to the allegations of the previously dismissed Amended Complaint. (*Id.*) The defendants add that, to the extent the 2AC adds new allegations, they are wholly conclusory. (*Id.*)

In its response, MAH asserts that the May 4, 1995 letter agreement executed between Mr. Hawkins and its corporate predecessor, Bio-Pharm, represented the initial understanding between the parties, whereby Mr. Hawkins agreed not to directly invest in the Project without first securing MAH's prior written consent. (Docket No. 59 at 16.) It adds that this understanding was reflected in the subsequent course of conduct between the parties. (*Id.*) Specifically, it cites the 2AC's allegations concerning Mr. Hawkins' awareness of how MAH was to be compensated through profit participation and management fees, gained by his investments both in MedApproach and in a separate project managed by Mr. Daniel containing the same terms of compensation. (*Id.*) MAH also points to Mr. Hawkins' investment of funds in the Project only through MedApproach until he sought permission to transfer a portion of his wife's interest to Shiroyama, Campenile, River Valley, and West Fork in June 1999. (*Id.* at 16-17.)

To state a viable claim for breach of contract under Tennessee law, the plaintiff must establish the following three essential elements: (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of that contract; and (3) damages caused by the breach of contract. *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006). A contract that is implied in fact is one that "arise[s] under circumstances which show mutual intent or assent to contract." *Givens v. Mullikin ex rel. Estate of McElwaney*, 75 S.W.3d 383, 407 (Tenn. 2002) internal quotation marks and citations omitted). It "may result as a legal inference

15

from the facts and circumstances of the case, but to be enforceable, the implied contract must nevertheless be supported by mutual assent, consideration, and lawful purpose." *Id.* (internal quotation marks and citations omitted).

In its previous Memorandum Opinion granting the defendants' first Motion to Dismiss, the court considered and rejected MAH's argument regarding the May 4, 1995 letter agreement. (Docket No. 47 at 15-16.) Specifically, the court noted:

> Mr. Hawkins' obligation in the May 4, 1995 letter agreement to seek Bio-Pharm's written consent prior to investing in the mifepristone project was expressly conditioned upon Mr. Hawkins *not investing* in the project through Bio-Pharm or an entity in which it had an interest. However, because Mr. Hawkins did, in fact, agree to invest in the project through MedApproach, the purported non-circumvention obligation never arose.

(*Id.* at 16.) The court also considered and rejected MAH's argument concerning Mr. Hawkins' investment activities up until 1999. (*Id.* at 15-16.) Moreover, the court fails to see how Mr. Hawkins' awareness concerning the method by which Mr. Daniel was to earn his compensation with respect to funds invested in the Project through MedApproach sheds light on the altogether separate question of whether Mr. Hawkins had agreed to invest funds in the Project solely through entities under Mr. Daniel's control.

MAH also cites the 2AC's allegation that Mr. Hawkins understood from his introduction to the Project in 1995 that he could only invest through Mr. Daniel. (Docket No. 53 ¶ 9.) However, the only specific event referenced in the 2AC that allegedly reflected the parties' understanding in 1995 is the May 4th letter agreement, which the court has already concluded did not place an exclusivity obligation on Mr. Hawkins. (*Id.* ¶ 8.) MAH has thus failed to

sufficiently plead that the parties mutually assented to an exclusivity contract.  Notably, it also fails to allege what consideration it offered to secure Mr. Hawkins' alleged promise.

In sum, MAH has failed to allege circumstances from which this court can reasonably infer that Mr. Hawkins and MAH impliedly agreed to a contract requiring him to exclusively invest in the Project through an entity under Mr. Daniel's control.  In light of the foregoing discussion, the court similarly finds that MAH has failed to allege that Sharon Hawkins, the alleged assignee of her husband's MedApproach interests and obligations, was similarly bound under an implied exclusivity contract.  Accordingly, MAH's breach of contract claim will be dismissed.

### C.      Fraud

MAH alleges that it was the victim of a fraudulent scheme perpetrated by the defendants to move varying portions of Sharon Hawkins' limited partnership interest invested in the Project through MedApproach into other entities where those interests, along with the addition of new funds, could be directly invested into the Project free and clear of MAH's profit participation and management fees.  The fruits of the scheme (the avoidance of MAH's fees) were allegedly obtained through Mr. Hawkins' use of false representations.  Under Tennessee law, a plaintiff must establish the following elements to state a claim of fraudulent or intentional misrepresentation:

> 1) the defendant made a representation of an existing or past fact; 2) the representation was false when made; 3) the representation was in regard to a material fact; 4) the false representation was made either knowingly or without belief in its truth or recklessly; 5) plaintiff reasonably relied on the misrepresented material fact; and 6) plaintiff suffered damages as a result of the misrepresentation.

*Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008) (quoting *Metro. Gov't of Nashville & Davidson Cnty. v. McKinney*, 852 S.W.2d 233, 237 (Tenn. Ct. App. 1992)).

In their initial moving papers, the defendants argued that the 2AC failed to allege that MAH detrimentally relied on any of Mr. Hawkins' representations.  (Docket No. 56 at 15-18.) However, in the course of advancing this argument, the defendants chose to focus solely on the direct investment of new funds into the Project by Shiroyama and Resurgence in 1999 and 2000. (*Id.*)  In doing so, they correctly pointed out that MAH could not show detrimental reliance, absent an obligation by the defendants to exclusively invest in the Project through an entity controlled by Mr. Daniel.  (*Id.*)  In its opposition brief, the plaintiff seized on the defendants' apparent failure to recognize that a substantial component of its fraud claim concerns the assignment of varying portions of Mrs. Hawkins' interest already invested in MedApproach to other entities.  (Docket No. 59 at 5.)  Indeed, MAH proclaimed that "[t]his case concerns investments already made and transferred and new investments made under false pretenses in 1999 and 2000."  (*Id.*)

The defendants have accordingly modified their arguments in their reply brief.  As for the direct investment of new funds into the Project by Shiroyama and Resurgence, the defendants repeat their contention that MAH's fraud claim must fail because it has not alleged that either Greg or Sharon Hawkins were bound to exclusively invest in the Project through an entity under Mr. Daniel's control.  (Docket No. 62 at 7.)  As for those preexisting MedApproach interests belonging to Mrs. Hawkins that were assigned to the various LLCs, the defendants advance two arguments.  First, they contend that MAH could not have detrimentally relied upon the false representations that prompted it to consent to the assignment of a portion of Mrs. Hawkins'

MedApproach interest to Shiroyama, because even in the absence of such representations, it would not have been entitled to any profit participation fees. (Docket No. 62 at 9-10.) Second, they assert that MAH cannot state a claim for fraud with respect to the assignment of varying portions of Mrs. Hawkins' interest to Campenile, River Valley, and West Fork, because the 2AC does not allege that Mr. Hawkins' representations were false. (*Id.* at 9.) Specifically, they argue that the 2AC is devoid of any allegation that either Greg or Sharon Hawkins ever owned or had any interest in any of those entities. (*Id.*) The court will first address the defendants' arguments concerning the assignment of Mrs. Hawkins' interests to the various LLCs before turning its attention to the arguments about the direct investment of new funds into the Project.

### 1) Assignment of Sharon Hawkins' Interests

#### (a) Shiroyama

The crux of MAH's detrimental reliance argument as it pertains to Shiroyama is that Mr. Daniel relied upon Mr. Hawkins' false representations concerning the defendants' lack of interest in the entity by agreeing to the assignment of a portion of Mrs. Hawkins' interest and thus relinquishing its entitlement to profit participation and management fees that would have otherwise attached. However, as the defendants note, MAH was not entitled to a profit participation fee on the $320,000 interest assigned to Shiroyama. (Docket No. 62 at 9.) To support this contention, they cite to a July 25, 2000 cover letter from the Controller of Danco Investors Group to Mr. Hawkins' accountant, indicating that the June 1999 assignment of varying portions of Mrs. Hawkins' limited partnership interest to Shiroyama, Campenile, River Valley, and West Fork specifically came from DIG Special Assets.[7] (Docket No. 63-2.) Again,

---

[7] The court may consider this document in the course of ruling upon the pending motion. Indeed, it is integral to the 2AC, since it concerns the assignments of interests that form the basis

19

DIG Special Assets was created pursuant to the MedApproach reorganization that took place in December 1999, but was retroactively effective as of January 1, 1999. In a December 9, 1999 letter sent to Mrs. Hawkins summarizing the reorganization, Mr. Daniel, describing DIG Special Assets, wrote that MAH's "profit participation is eliminated in this partnership."[8] (Docket No. 63-1.) MAH has not disputed the defendants' contention regarding MAH's lack of entitlement to profit participation fees on the $320,000 interest assigned to Shiroyama. Nor has it disputed the contents of any of the documents upon which the defendants rely, each of which were either referenced in the 2AC or otherwise integral to its allegations.

What remains, then, is MAH's contention regarding lost management fees.[9] The argument assumes that the assignment of Mrs. Hawkins' interest to Shiroyama moved that interest beyond the reach of MAH's management fees. The limited partnership agreement of

---

of MAH's fraud claim and specifies the source from which those assignments were made. Moreover, MAH has raised no objections to the authenticity or relevance of this document. *See Mediacom Se. LLC*, 672 F.3d at 400.

[8] The court has already explained why it may consider this document while ruling upon the pending motion. *See supra* n. 4.

[9] While the defendants do not directly address the topic of management fees, they have raised the issue of detrimental reliance in their Motion, and the plaintiff has continued to assert that lost management fees constitute a component of the injury it suffered after relying on Mr. Hawkins' allegedly false statements.

DIG Special Assets,[10] the entity from which a portion of Mrs. Hawkins' interest was assigned, provides the following on the topic of assigning limited partnership interests:

> The Limited Partnership Interest of any Limited Partner in the Partnership, in whole or in part, or any beneficial interest therein, may not be assigned without the prior written consent of the General Partner, which consent may be withheld in the sole discretion of the General Partner. Upon such an assignment of a Limited Partnership Interest with the consent of the General Partner, the assignee shall become a Limited Partner upon the execution of such agreements and other documents as shall be required by the General Partner.

The 2AC alleges that Mr. Daniel, on behalf of MAH, the general partner of DIG Special Assets, consented to the assignment to Shiroyama. What it fails to allege, however, is whether the necessary paperwork was completed such that Shiroyama became a Limited Partner. If that were indeed the case, then the assumption underlying MAH's argument concerning lost management fees would be undermined, as the assigned interest would still be held within the scope of the limited partnership and would thus be subject to the applicable management fees. Under this scenario, MAH could not reasonably complain that it detrimentally changed its position in reliance on Mr. Hawkins' alleged misrepresentations.

Nevertheless, the court must analyze what the plaintiff has actually pled. The 2AC alleges that MAH consented to the Shiroyama assignment on the basis of Mr. Hawkins' misrepresentations and, as a result, deprived itself of management fees that it otherwise would have earned. While the 2AC fails to address whether Shiroyama became a Limited Partner in

---

[10] The 2AC makes reference to the various "partnership agreements" which governed the assignment of limited partnership interests and compensation of the general partner. (Docket No. 53 ¶¶ 7, 45, 76, and 81.) The defendants previously attached a copy of the limited partnership agreement of DIG Special Assets in support of its Motion to Dismiss the Amended Complaint. (Docket No. 34-8.) The plaintiff does not dispute this document's authenticity or relevance. Accordingly, the court may consider it while ruling on the pending motion. *See Mediacom Se. LLC*, 672 F.3d at 400.

DIG Special Assets upon receiving the assigned interest, the court acknowledges that, at this stage of the proceedings, it must review the factual allegations in the light most favorable to MAH and draw all reasonable inferences in its favor. With those standards in mind, the court finds that the 2AC sufficiently alleges the element of detrimental reliance as it pertains to the issue of lost management fees stemming from the assignment of Sharon Hawkins' interest to Shiroyama.

### (b) Campenile, River Valley, and West Fork

MAH's fraud claim pertaining to the assignment of portions of Sharon Hawkins' interest to each these entities will be dismissed. As the defendants point out, the 2AC lacks any allegation that either Greg or Sharon Hawkins owned or otherwise benefitted from any of these entities. The plaintiff does not dispute this contention. When it previously dismissed MAH's fraud claim for failing to satisfy Federal Rule of Civil Procedure 9(b)'s particularity requirements, the court noted, among other things, that the Amended Complaint did not set forth why Mr. Hawkins' alleged representations disclaiming any personal interest in these assignments were false, but instead only alleged that falsity could be reasonably inferred from the circumstances surrounding the Shiroyama assignment. (Docket No. 47 at 11.)

The 2AC fails to remedy this defect. While it continues to allege that Mr. Hawkins told Mr. Daniel that the portions of Mrs. Hawkins' interest that were to be assigned to Campenile, River Valley, and West Fork were sweeteners and that neither he nor his wife had any beneficial interest in these entities, it fails to allege why either of these representations was actually false. Apparently acknowledging this shortcoming, MAH requests in the 2AC the opportunity to conduct discovery into these entities' ownership. (Docket No. 53 ¶ 69.) However, to grant such

an opportunity to the plaintiff under the present circumstances would contravene one of the

primary purposes underlying Rule 9(b) - that is, to prevent fishing expeditions. *Chesbrough v.*

*VPA, P.C.*, 655 F.3d 461, 466-67 (6th Cir. 2011). The court will accordingly dismiss MAH's

fraud claim concerning the assignment of interests to Campenile, River Valley, and West Fork.

### 2) Direct Investment of New Funds into the Project

MAH's fraud claim also encompasses the investment of new funds by Greg and Sharon

Hawkins into the Project from Shiroyama and Resurgence in 1999 and 2000. Specifically, MAH

alleges that it permitted these direct investments into the Project in reliance on Greg Hawkins'

false representations and, as a result, lost profit participation and management fees that would

have otherwise attached. The defendants contend that this aspect of the plaintiff's fraud claim

must also be dismissed because MAH has failed to allege any detrimental reliance. The court

agrees.

As the defendants argue, for MAH to have detrimentally relied upon Mr. Hawkins'

representations insofar as they relate to these direct investments of new funds, it must show that

Greg and Sharon Hawkins were obligated to make any investments into the Project solely

through an entity under Mr. Daniel's control. If no such obligation existed in the first place, and

the defendants were free to invest in the Project either directly or indirectly through an entity

controlled by Mr. Daniel, then MAH cannot reasonably allege that it changed its position in

reliance on Mr. Hawkins' false representations. The court has already found that MAH has

failed to allege the existence of an implied exclusivity agreement. Moreover, MAH has not

otherwise identified any other sources from which an exclusive investment obligation can be

reasonably inferred.  Accordingly, MAH has failed to allege the element of detrimental reliance in connection with these investments and the fraud claim pertaining to them will be dismissed.

### 3)       Liability of Sharon Hawkins

In sum, the court has concluded that the 2AC sufficiently states a claim for fraud insofar as it relates to the issue of lost management fees stemming from the assignment of a portion of Sharon Hawkins' limited partnership interest to Shiroyama.  What remains an open question, however, is whether MAH can hold Mrs. Hawkins liable under this theory.  It asserts that it can do so under the principles of agency.  Specifically, MAH alleges that, at all relevant times, Mr. Hawkins acted on behalf of his wife when making the alleged misrepresentations to Daniel. (Docket No. 53 ¶¶ 71, 73.)  MAH also asserts that Mrs. Hawkins benefitted by her husband's false statements, as she was able to move a portion of her interest outside the reach of the plaintiff's profit participation and management fees.  (*Id.* ¶¶ 73-74.)

The defendants contend that the 2AC fails to sufficiently plead the existence of an agency relationship.  (Docket No. 56 at 19.)  While they do not dispute MAH's allegation that Mr. Hawkins acted on behalf of his wife in connection with the assignment to Shiroyama, they argue that dismissal is warranted because the 2AC does not allege that Sharon Hawkins exercised control over the conduct of her husband.  (*Id.*)  In *White v. Revco Discount Drug Ctrs., Inc.*, the Tennessee Supreme Court stated the following concerning the general principles of agency:

> Important in the concept of agency, of course, is that a principal is generally bound by its agent's acts done in its behalf and within the actual or apparent scope of the agency.  The focus of this inquiry, however, is placed upon the actions and consent of the principal, rather than upon the agent's actions or the willingness of the agent to perform those actions.  Although the principal's right to control the actions of the agent is an important factor in finding the existence of

>an agency relationship, the right of control is not necessarily as important as the principal's exercise of actual control over the agent.

33 S.W.3d 713, 723 (Tenn. 2000). The defendants rightly note that the 2AC lacks any allegations from which it can be reasonably inferred that Sharon Hawkins either had the right to control her husband's actions or otherwise exercised actual control over them.

However, as both parties recognize, in Tennessee, one spouse may be liable for the fraudulent acts of the other through ratification - that is, "by accepting or retaining the benefits of the act knowing it was tainted with fraud." *Dodson v. Anderson*, 710 S.W.2d 510, 512 (Tenn. 1986). Although the 2AC's allegations concerning ratification are somewhat thin, the court believes that, when viewed in the light most favorable to the plaintiff, they are sufficient to withstand the defendants' motion. MAH alleges that Mrs. Hawkins consented to the Shiroyama assignment. (Docket No. 53 ¶31.) It also alleges that the giving of such consent was one of the overt acts of a common scheme between herself and Mr. Hawkins designed to deprive MAH of its management fees through the device of false representations. (*Id.* ¶ 76.) The 2AC generally alleges that this scheme was perpetrated with her knowledge, consent, and participation. (*Id.*) In addition, it alleges that Sharon Hawkins retained the benefits of the fraudulent scheme, since her assigned interest was invested directly into the Project without being subject to MAH's management fees. (*Id.* ¶ 73-74.) Accordingly, the fraud claim against Mrs. Hawkins shall proceed insofar as it concerns the issue of lost management fees resulting from the Shiroyama assignment.

**D.     Civil Conspiracy**

The defendants' argument seeking dismissal of MAH's civil conspiracy claim is dependent upon the absence of an underlying tort - namely, fraud.  (*See* Docket No. 56 at 15) (arguing that the civil conspiracy claim should be dismissed because the 2AC fails to allege the existence of fraud); *see also Stanfill v. Hardney*, No. M2004-02768-COA-R3-CV, 2007 WL 2827498, at *7 (Tenn. Ct. App. Sept. 27, 2007) (noting that a civil conspiracy claim requires "the existence of an underlying tort or wrongful act committed by one or more of the conspirators in furtherance of the conspiracy") (citing *Forrester v. Stockstill*, 869 S.W.2d 328, 330 (Tenn. 1994); *Tenn. Publ'g Co. v. Fitzhugh*, 52 S.W.2d 157, 158 (Tenn. 1932); *Levy v. Franks*, 159 S.W.3d 66, 82 (Tenn. Ct. App. 2004)).  However, the court has already concluded that the 2AC states a claim for fraud, albeit a limited one.  Moreover, given the preceding discussion about Mrs. Hawkins' liability, the 2AC alleges the remainder of the required elements of a claim for civil conspiracy.  *See Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (noting that the elements of a civil conspiracy claim are: "(1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury").  Accordingly, the defendants' motion to dismiss this claim will be denied.

## CONCLUSION

For all of the reasons discussed herein, the Defendants' Motion to Dismiss (Docket No. 55) will be **GRANTED** in part and **DENIED** in part. In particular, all of MAH's claims against the defendants will be dismissed, with the exception of the fraud and civil conspiracy claims pertaining to the loss of management fees resulting from the Shiroyama assignment.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge