UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MEDAPPROACH HOLDINGS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 3:11-cv-1199 |
| v. ) | Judge Aleta A. Trauger |
| ) | |
| GREGORY D. HAWKINS AND SHARON ) | |
| HAWKINS, ) | |
| ) | |
| Defendants, ) | |
| ) | |

## MEMORANDUM

Defendants Gregory D. Hawkins and Sharon Hawkins have filed a Motion for Summary Judgment (Docket No. 90), to which the plaintiff, MedApproach Holdings, Inc. ("MAH") filed a Response in opposition (Docket No. 93), and the defendants filed a Reply (Docket No. 95). For the reasons stated herein, the motion will be denied.

## BACKGROUND[1]

---

[1] Remarkably, the parties did not conduct any discovery in this case. They rely on affidavits and documents in the record filed at different points in the case, including materials related to the instant motion and two Rule 12 motions filed by the defendants (and addressed by the court) at an earlier stage. (*See, e.g.*, Docket No. 32, Attachment Nos. 2-4 (Certification of Sharon Hawkins with attached Exhibits) and 5-10 (Certification of Gregory Hawkins with attached Exhibits); Docket No. 34, Attachment Nos. 2-8 (Certification of Scott Thompson with attached Exhibits); Docket No. 39 (Affidavit of W. Bradley Daniel with attached Exhibits); Docket No. 44, Attachment No. 1 (Certification of Sharon Hawkins); Docket No. 91, Exs. 1 (Declaration of Greg Hawkins with attached Exhibits), (Declaration of James J. McEntee), and 3 (Declaration of Sharon Hawkins)); Docket No. 91, Ex. 1 (Declaration of W. Bradley Daniel)). In reliance on materials in the record, the defendants filed a Statement of Undisputed Material Facts (Docket No. 92), to which MAH filed a Response (Docket No. 93), and MAH filed a Statement of Additional Disputed Facts (Docket No. 94), to which the defendants filed a Response (Docket

1

The procedural and factual background of this case is set forth in previous opinions of this court, familiarity with which is assumed. Fundamentally, the case concerns a collaboration among Bradley Daniel/MAH, Gregory Hawkins ("Hawkins"), and Sharon Hawkins ("Mrs. Hawkins") – along with many other individuals – to invest and profit from the marketing and distribution of the RU-486 abortifacient drug in the United States (the "project"). The history of this collaboration involves a byzantine set of corporate and financial transactions, the full extent of which are not necessary to recount in this opinion. The court summarizes only the most relevant facts in this section.

In the mid-1990's, Daniel essentially created a fund ("Old MedApproach") for investors to place their money, and Hawkins invested several million dollars in Old MedApproach and the underlying project by various means (investments, loans, etc.). BioPharm Investments, Inc. ("BioPharm"), of which Daniel was a principal, was the General Partner of Old MedApproach. With respect to this business venture, it earned money (or stood to earn money) by receiving management fees (a percentage of the investment fund) and profit participation fees (a cut of any profits after redistribution of capital).

In the 1997-1998 time frame, several relevant events occurred: Old MedApproach acquired a controlling interest in the underlying Project (which another entity had owned and in which other investors had previously invested independently of Old MedApproach), Old MedApproach agreed to buy out any pre-existing investors who sought rescission of their investments, and Hawkins promised to finance the rescission purchases on behalf of Old MedApproach. Essentially, Hawkins agreed to finance a set of multi-million dollar buyouts,

No. 96). The court's summary of the facts is drawn from the parties' respective factual statements and the underlying evidentiary materials in the record.

which were scheduled to occur in June 1999. After making this promise, Hawkins ran into financial difficulty when a separate venture of his failed, thereby causing him significant liquidity issues and (he claimed) threatening his ability to finance the upcoming rescission purchases.

Hawkins spoke with Daniel about the upcoming rescission purchases. Both Hawkins and Daniel agree that Hawkins expressed concern about his ability to fund those purchases, although they recall Hawkins' representations about his financial situation differently. Hawkins maintains that he simply told Daniel that he had "liquidity issues" that would interfere with his ability to honor his financing commitment (as well as his ability to make any future investments), whereas Daniel contends that Hawkins said he was "broke." At any rate, they agree that Hawkins made two requests: (1) Hawkins asked whether, in light of his financial difficulties, he could solicit third-party investors to ensure that the fund had adequate financing for the rescission purchases; and (2) he asked for permission to transfer interests in the fund and the underlying project to his wife's name, apparently to protect them in some fashion from the consequences of the collapse of Hawkins' separate (unrelated) venture.

At different times, Daniel, in his capacity as the principal of BioPharm, assented to both of these requests. After receiving BioPharm/Daniel's permission, Hawkins transferred the interests into his wife's name and purported to solicit potential third-party investors. During the same time frame, the investment fund (*i.e.*, Old MedApproach) was reorganized. The assets of the original fund were split off into three new entities, MedApproach L.P. ("MedApproach"), DIG Equity, and DIG Special Assets. MedApproach Holdings ("MAH"), of which Daniel was a principal, became the General Partner of each of these entities (essentially occupying the role that BioPharm held with respect to Old MedApproach), and Mrs. Hawkins became a limited

3

partner in each of the three new entities. As with BioPharm before it (with respect to the assets of Old Med Approach), MAH stood to profit by receiving fees from each of the new companies, including, collectively, (1) profit participation fees and (2) management fees. In relevant part, with respect to the assets held by DIG Special Assets, MAH was entitled only to management fees.[2]

In connection with soliciting new investors, Hawkins decided that he needed to provide the additional investors a "sweetener" of additional funds (free capital investment), which would come out of an existing $3 million investment that they had made in the project.[3] Hawkins in fact solicited new investors, each of whom received, with permission from Daniel, a "sweetener" consisting of a *pro rata* share of the $3 million investment in the project. However, Hawkins told Daniel that certain potential investors were willing to invest only if their identities remained confidential, due to the controversial nature of the RU-486 drug. In most relevant part, Hawkins told Daniel that a priest was willing to invest in the project, provided that the priest's identity would not be disclosed.[4] Hawkins and this individual, whose name was James McEntee, discussed the potential investment multiple times in 1998 and 1999.

---

[2] MAH was entitled to collect both profit participation fees and management fees on assets held by the other two entities, MedApproach and DIG Equity. However, the assets of DIG Special Assets were subject to management fees but not profit participation fees. (*See* Docket No. 63, Ex. 1 at p.7.)

[3] As best the court can discern, an investor who received a "sweetener" would essentially receive a free infusion of capital into the non-descript investment fund and, assuming the Project turned out to be profitable, would profit from that additional capital as if he or she had invested the money herself.

[4] This individual was not in fact a priest. Hawkins avers that he never told Daniel that the investor was a priest; instead, he maintains that he merely told Daniel that the potential investor was a person of strong moral and religious conviction who wanted to conceal his identity as a

Ostensibly to honor that request, Hawkins created "Shiroyama LLC" as a company in which the priest could invest secretly. At an unspecified point shortly before the June 1999 closing date for the rescission purchases, Hawkins asked Daniel to permit Mrs. Hawkins to transfer $320,000 from DIG Special Assets to Shiroyama as a sweetener for the priest's investment. Hawkins assured Daniel that he (Hawkins) and his wife had no financial interest in Shiroyama and, therefore, would not stand to benefit from transferring those funds.

Based on Hawkins' representations, Daniel approved the transfer of the requested funds to Shiroyama on June 14, 1999, believing that the transfer was being made as a "sweetener" for investment by the priest. Once transferred to Shiroyama, the transferred funds were no longer subject to MAH's management fees (as they had been when they were assets of DIG Special Assets). Therefore, in approving the transfer, Daniel sacrificed MAH's right to earn its 1% yearly management fee on that block of money.[5] At or near the time of closing, Shiroyama apparently invested well over $320,000, which Daniel believed reflected a combination of (a) the

---

condition of investment. Hawkins avers one thing; Daniel avers another. In the absence of any contemporaneous documentation that would refute Daniel's recollection, the court must credit Daniel's recollection for purposes of the motion.

[5] MAH contends that the money transferred to Shiroyama was made from *MedApproach* (whose funds were subject to 20% profit participation fees in addition to management fees), not from DIG Special Assets. For reasons explained in the court's previous opinions, the court has found that the funds were transferred from DIG Special Assets. MAH's only support for its continuing objection to this conclusion is a self-serving averment in an earlier declaration from Daniel, in which Daniel stated, without reference to any underlying records, that the funds were transferred from MedApproach. At any rate, here, aside from objecting to the defendants' assertion that assets transferred to Shiroyama came from DIG Special Assets, MAH does not argue that the court's previous conclusion concerning profit participation fees relative to Shiroyama should be revisited, let alone identify any records showing why reconsideration would be appropriate.

$320,000 sweetener allocation from Mrs. Hawkins' interests in DIG Special Assets, and (b) an additional investment of funds by the priest.

Daniel contends that Hawkins made several false statements to him to induce MAH to approve the $320,000 transfer to Shiroyama and the total investment from Shiroyama:

- The potential investor was not in fact a "priest."

- The potential investor, McEntee, never committed to funding the project: instead, McEntee essentially told Hawkins that he would merely entertain the offer to invest because Hawkins was his friend, but expressed to Hawkins that he had serious moral and religious convictions about the drug at issue, which he would have to consider before investing.

- McEntee never in fact invested in Shiroyama either before or after the June 14, 1999 closing. Instead, unbeknownst to Daniel, Hawkins in fact infused Shiroyama with funds of his own.

- Hawkins was not in fact "broke" – at most, he was suffering some type of financial difficulty with his other company that, apparently, did not prevent him from investing his own money in Shiroyama and at least one other special-purpose LLC.

- Despite disclaiming any interest in Shiroyama, Hawkins actually owned 100% of Shiroyama. According to Daniel, Hawkins intended all along to invest his own funds in Shiroyama, if the potential investor (Mr. McEntee) did not invest through Shiroyama – which is exactly what happened.

Daniel believes that Hawkins and his wife had an ulterior motive to make these misrepresentations: by deceiving Daniel to approve the transfer of funds to Shiroyama, they were able to clear that block of money ($320,000) from the management fee obligation to MAH, while retaining (and expanding upon) their initial investment.

Hawkins claims that he continued to discuss potential investment by McEntee following the June 14, 1999 closing. McEntee avers that he informed Hawkins in late 1999 or early 2000 that he would not invest in the project. Hawkins claims that, until he received this final denial from McEntee in late 1999 or early 2000, he honestly believed that McEntee was planning to

invest. Notably, Hawkins' declarations in this case are not entirely consistent concerning McEntee. Earlier in the case, he represented that McEntee had "backed out" of a promised investment, whereas Hawkins now admits (and McEntee confirms) that McEntee never actually agreed to invest through Shiroyama at any point.

Finally, Sharon Hawkins disclaims essentially any knowledge concerning the circumstances of the Shiroyama transfer. She has no ownership interest in Shiroyama, she says that she never discussed Shiroyama with her husband prior to 2012, and she says that she had no knowledge of any discussions between or among Daniel, Hawkins, and McEntee related to Shiroyama. She claims to have no knowledge of the rationale for the transfer and says she made no agreement with her husband to participate in a "scheme" to defraud MAH of its management fees on the transferred assets. MAH contends that, notwithstanding her denials, Sharon Hawkins schemed with her husband or at least ratified and benefited from his conduct. According to Daniel, he had many discussions with Mrs. Hawkins concerning the investments in her name, and she "was never a mere straw holder of Mr. Hawkins' interests." Daniel also avers that Hawkins generally held himself out as acting on behalf of himself and Mrs. Hawkins.

Finally, Daniel avers that, subsequent to the June 1999 closing and in advance of this lawsuit, Hawkins refused to disclose the identity of the investor in Shiroyama, purportedly on grounds of confidentiality. Hawkins also asked Daniel to confirm that MAH would not receive fees of any kind related to Shiroyama, which Daniel confirmed.

In sum, MAH alleges that, with respect to the 1% management fee on the assets transferred to Shiroyama, Hawkins and his wife (1) defrauded MAH (by making misrepresentations to Daniel to induce his consent to the sweetener transfer), and (2) conspired to defraud MAH. The defendants seek summary judgment on these claims. The parties

7

essentially dispute just two issues: (1) can the record support an inference that Hawkins had the requisite intent to deceive Daniel?, and (2) can the record support fraud or conspiracy claims against Mrs. Hawkins?

## **SUMMARY JUDGMENT STANDARD**

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2014). At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its burden by showing that there is an absence of evidence to support the non-moving party's case. *Id.* (citing *Celotex*, 477 U.S. at 325). "When the moving party has carried this burden, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).) The non-moving party also may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. *Id.*

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Moldowan*, 578 F.3d at 374 (quoting *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "In evaluating the evidence, the court must draw all inferences in the light

8

most favorable to the nonmoving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587). But "[t]he mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient," *Moldowan*, 578 F.3d at 374 (quoting *Anderson*, 477 U.S. at 252), and the non-movant's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249. An issue of fact is "genuine" only if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587).

## **ANALYSIS**

Hawkins argues with some force that it would have made little sense for him to deceive MAH out of $3,200 per year in management fees on his multi-million dollar investments to that point. In an affidavit, he contends that his purposes were noble: he honestly believed, both before and after the June 14, 1999 closing, that McEntee intended to invest in the project, and Hawkins' only interest was to finance the rescission purchases to keep the underlying project afloat.

As a general matter, drawing inferences concerning state of mind at the Rule 56 stage is inappropriate, at least where reasonable minds can disagree. *See Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1448 (6th Cir. 1993). Here, it would be surprising if Hawkins went to such great lengths simply to avoid a $3,200 per year fee on a fraction of his/his wife's investments in the venture. Be that as it may, the court cannot say that, as a matter of law, no reasonable jury could find otherwise. Indeed, drawing all reasonable inferences in favor of MAH, there are several indicia of potentially fraudulent intent: Hawkins lied to Daniel about having no financial interest in Shiroyama; Hawkins overstated the nature of his financial predicament to Daniel, because Hawkins apparently was able to fund most of the total

9

investment by Shiroyama at the rescission purchase closing; Hawkins falsely claimed that an investor had committed to fund the project through Shiroyama, when in fact no commitment had been made; Hawkins never told Daniel that he had invested his own money in Shiroyama; and Hawkins refused to identify the Shiroyama investor (which was Hawkins himself) to Daniel for a long period thereafter, suggesting that he was hiding the truth from Daniel. Hawkins also has made seemingly inconsistent representations about whether McEntee had committed to invest before the June 1999 closing. These facts are sufficient to create a genuine dispute of material fact concerning whether Daniel had the requisite intent to defraud MAH.

With respect to Mrs. Hawkins, the evidence is weaker. MAH points out that Mrs. Hawkins was involved in the project's funding for many years, including, among other things, (1) becoming a limited partner in the fund, (2) consenting to the fund's reorganization, (3) receiving K-1 tax forms, (4) accepting checks and wire transfers, (5) discussing business matters with Daniel in person and in writing, and (6) permitting the transfer of funds into Shiroyama in connection with the closing. However, Mrs. Hawkins has averred (multiple times now) that she was essentially ignorant of her husband's motives and made no representations to Daniel that are relevant to the remaining claims at issue. Mr. Hawkins corroborates her account.

As the court previously held in this case, Tennessee does not require that Mrs. Hawkins have made any affirmative representations to MAH to be liable for fraud. Instead, she can be held liable for "accepting and retaining the benefits of the act knowing it was tainted with fraud" – *i.e.*, by knowingly ratifying her husband's conduct. *Dodson v. Anderson*, 710 S.W.2d 510, 512 (Tenn. 1986). Although the evidence supporting a fraud claim against Mrs. Hawkins is thin, a jury reasonably could disbelieve Mrs. Hawkins' self-serving statements about her lack of knowledge concerning Shiroyama, particularly because the funds were in her name and she

10

essentially transferred them to her own husband to their mutual financial benefit. Given the apparently low legal burden to establish fraud with respect to Mrs. Hawkins in this case, the court will permit the fraud claim against Mrs. Hawkins to proceed to trial. Nevertheless, the court is cognizant that the case against Mrs. Hawkins is weak; thus, depending on the evidence adduced at trial, a directed verdict in her favor on the fraud claim (and, consequently, the conspiracy claims against both her and her husband) may be warranted.

Because the court concludes that the fraud claims against both Mr. and Mrs. Hawkins will proceed to trial, the court finds that the conspiracy claims, which are premised on the fraud claims, will also proceed to trial.

## **CONCLUSION**

For the reasons stated herein, the defendants' Motion for Summary Judgment will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge